MERCHANTS NATIONAL BANK, Appellee, v. G. W. GRIGSBY, Appellant.

**SALES:** Warranty—Breach—Failure of Buyer to Return—Waiver.
1  When the buyer of a stallion, warranted to be a sure breeder, was, under the conditions of warranty, required to accept an-

other animal and return the first animal by a certain date, the statement of the seller, in response to a request from the buyer for another animal because the warranty on first one was breached, that he, the seller, had at that time no other animal to send, but would have others in the fall, would justify a finding that the seller waived the return, if the jury should find that the buyer could not in reason be expected to lose the service of the stallion for the entire season.

**SALES:** Warranty—Waiver of Conditions—Subsequent Extension of
2   Contract—Effect. The effect of the waiver of the conditions of a warranty, in the absence of fraud, is entirely nullified by a subsequent extension to a future date of the entire terms of the contract.

**SALES:** Warranty of Animal Diseased When Purchased—Burden of
3   Proof—Waiver. A warranty that a stallion is a sure breeder "provided he keeps in as sound and healthy condition as he now (date of sale) is," and to be returned by the buyer in case the warranty is breached, does not give the buyer a right to return the animal for a disease not existing at the time of sale, but does give him the right to return for a disease existing when bought. *The buyer must shoulder the burden to so show.* If he is successful, then the flat refusal of the seller to receive back the horse is, of course, a waiver of the duty to return.

**SALES:** False Representations—Scienter—Sufficiency of Evidence.
4   In order to avoid a sale by reason of false representations, the material things to show are (a) the representations, (b) the falsity, and (c) the seller's knowledge of the falsity. In instant case, evidence reviewed and held sufficient to carry the question of *scienter* to the jury.

PRINCIPLE APPLIED: The seller was an experienced importer of horses from Belgium, where a progressive, incurable disease known as "summer sores" was prevalent, and usually found in imported horses. These sores could be dried up during winter. The buyer knew nothing about the disease. The seller was familiar with the disease and had had experience with it in lawsuits over the sale of horses. The horse in question was imported from Belgium two months before sale. A characteristic of the disease was the continued loss of flesh. This horse was thin when bought and never improved. Veterinarians testified that the horse had the disease when bought. Small scars were noticed on the horse when bought, which might have been the result of dried up sores. When the horse was bought, the seller withheld delivery, saying he wanted to show the horse at

a Chicago horse show and improve his flesh. His condition in flesh did not improve and he was not exhibited. The seller said he thought best not to increase his flesh, and delivered the horse to the buyer in December. *Held,* evidence sufficient to go to the jury on the question of *scienter.*

BILLS AND NOTES: Title of Payee Defective—Negotiation to Avoid Defenses—Effect on Indorsee—Burden of Proof. The indorsee of a note may, in the first instance, rest on the presumption of law that he is a ''holder in due course.'' But the moment it appears that the title of the original payee was defective within the meaning of the Negotiable Instrument Law, or that the original payee has negotiated the note in order to prevent a defense thereto, then the indorsee must rest no longer. He must at once take the laboring oar and show that he is, in fact, a ''holder in due course.'' (Secs. 3060-a55, 3060-a59, Sup. Code, 1913.)

PRINCIPLE APPLIED: A note was negotiated as collateral security to an original loan twelve days before due, two installments of interest being then overdue. The indorser (payee) was a director of the plaintiff bank and agreed to bear the cost of litigation, but this was a long standing arrangement, as many such notes had been transferred and much litigation had resulted, with defenses the same as on note in question. The officers of the bank, other than the indorser, knew nothing about the maker and made no inquiry. Prior to the negotiation of the note, the maker and the payee of the note had had much controversy over a warranty of the horse for which the note was given, though plaintiff claimed defendant had never threatened defense but had asked for an extension of time. The maker (defendant) claimed, in defense to the note, both false, representations and breach of warranty of the horse. *Held,* the indorsee (plaintiff) had the burden of proof to show it was a ''holder in due course.''

*Appeal from Boone District Court.*—HON. R. M. WRIGHT, Judge.

SATURDAY, NOVEMBER 28, 1914.

REHEARING DENIED TUESDAY, JUNE 22, 1915.

ACTION at law upon a promissory note for $1,000. The payee of the note was J. Crouch & Son, who endorsed the

same to the plaintiff before maturity. The defendant admits the execution of the note, but sets up in defense a breach of warranty and false representations, and failure of consideration, and that the plaintiff is not a good-faith holder in due course. At the close of the evidence, there was a directed verdict for the plaintiff. The defendant appeals.—*Reversed*.

*Harpel & Cederquist*, for appellant.

*Read & Read*, for appellee.

EVANS, J.—The note in question was given on September 28, 1909, and was one of a series of three notes of $1,000 each, representing the purchase price of an imported stallion sold by the payee to the defendant upon such date. Delivery of the horse was made sometime in December, 1909. A written bill of sale was delivered to the purchaser, including a guaranty as follows:

"We have this day sold the imported Belgian stallion, Bon Espoir de Solre No. 4072 (31720) to G. W. Grigsby, of Madrid, Iowa, and we guarantee the said stallion to be a satisfactory sure breeder, provided the said stallion keeps in as sound and healthy condition as he now is and has proper care and exercise. If the said stallion should fail to be a satisfactory sure breeder with the above treatment, we agree to take the said stallion back, and the said G. W. Grigsby agrees to accept another imported Belgian stallion of equal value, in his place, the said stallion Bon Espoir de Solre No. 4072 (31720) to be returned to us at La Fayette, Indiana, in as sound and healthy condition as he now is by May 1, 1911."

Taking the evidence offered on behalf of the defendants as true, which we must do for the purpose of this appeal, the above warranty was breached, and the horse proved to be worthless. The horse was not a sure foal getter. Only a

very small percentage of his service resulted in foals. On or about July 1, 1910, the defendant discovered that the horse was infected with a disease called in this record "summer sores." This was manifested by the breaking out of certain sores upon various parts of the body at this time. The disease is one which was wholly unknown to the defendant prior to that time. Veterinary surgeons were called to the treatment of the horse. This disease is a progressive, incurable disease, running a course of a few years. It is made outwardly manifest upon the afflicted horse by the breaking out of sores in the summer time. These, in the early stages, may be temporarily cured or dried up during cold weather. During the first summer of such attack, such sores are usually small and may pass unnoticed by a person unfamiliar with the disease. They increase in virulence with every succeeding summer. Such was the course of the disease alleged in this case. The horse died therefrom on August 24, 1912. From the time the defendant received the horse, he gradually lost weight and so continued until his condition was very emaciated. This was consistent with the course of the disease.

The defendant pleaded not only breach of warranty but false representations, based largely upon the same state of facts and upon the further fact that the seller knew that the horse in question was not sound and healthy and was not a good breeder, and yet represented him to be such. The pleas of breach of warranty and false representations are somewhat mixed. Defendant's answer, as to the plea of false representation, is quite indefinite. In the absence of attack, we treat it as sufficient. The question submitted for our conclusion is that of the sufficiency of the evidence in support of the affirmative defenses. Was there sufficient evidence to go to the jury on the questions: (1) Of breach of warranty. (2) If there was breach of warranty, was the condition of the warranty waived by the seller? (3) Was the horse infected with the disease in its incipient stage at the time of the pur-

chase? (4) Did the plaintiff acquire the note in good faith and in due course?

1. The evidence of breach of warranty as

1. SALES: war-
ranty: breach:
failure of
buyer to re-
turn: waiver.

to the failure of the horse as a sure foal getter is abundant, and we need not recite it. Appellee does not contend otherwise.

The condition of the warranty, however, was never actually performed by the defendant, in this, that he never returned the horse to La Fayette, Indiana. His contention is that such return was waived by the conduct of the seller. In June, 1910, he wrote the following letter to the sellers:

"Madrid, Iowa, June 15, 1910.

"Mr. Crouch & Son, La Fayette, Ind. Dear Sir: Since writing you I have had six mares to return. I don't think this horse has settled anything bred to him. Have you got a Belgian horse that you could let me have to finish the season with. I would have to have a good one to fill his place. If I don't get another horse I don't know what I will do. Let me know by wire what you will do. Be sure and let me know what you will do as soon as you receive this.

"Yours respectfully,          G. W. Grigsby."

The sellers replied to this letter stating that they were entirely sold out of Belgian horses, but would have some more in the ensuing fall.

In view of this correspondence, it would have been an idle proceeding for the defendant to go through the form of returning his horse to La Fayette and demanding in exchange another Belgian stallion of equal value at that time. His letter was a fair request for an adjustment under the conditions of the guaranty. Crouch & Son had put it out of their power to perform their guaranty, for the time being. They were doubtless entitled to reasonable time and opportunity, but the defendant was certainly entitled to go to the jury on the question whether he could reasonably be required to lose the entire season and wait until fall for the exchange. If

not, then the sellers must be held to have waived the condition contained in the guaranty, and they thereby rendered their guaranty absolute.

On March 17, 1911, however, the written guaranty was by another writing extended to May 1, 1912. We think the effect of this writing was to extend the condition, likewise. The previous waiver of the condition, therefore, is no longer available to defendant, unless the extension was entered into through the fraud of Crouch & Son, as contended by defendant.

2. SALES: warranty: waiver of conditions: subsequent extension of contract: effect.

It was arranged between the parties at that time that the defendant should give the horse further trial and treatment. In December, 1911, the defendant again visited Crouch & Son and sought an adjustment. They told him at that time that under no consideration would they receive back the horse in his then condition, because of the sores upon his body. This refusal was based upon the contention that under the conditions of the warranty, the horse was to be returned in as "sound and healthy" condition as when received. This is a pivotal point in the defense. The defendant could not require Crouch & Son, under the conditions of the warranty, to take back the horse in his diseased condition unless such disease was already upon him in its incipient stage at the time the defendant purchased him. The burden was upon the defendant not only to prove breach of warranty, but to prove also a waiver of the condition as to returning the horse. If, in December, 1911, the defendant was legally entitled to return the horse in his then condition, and offered to do so, then the declaration of Crouch & Son was sufficient as a waiver of a formal return of the horse. The burden, therefore, was upon the defendant, to prove that the diseased condition of the horse, which formed the basis of the sellers' objection to his return, was already upon the horse in its incipient stage at the time of the sale to the defendant. This

3. SALES: warranty of animal diseased when purchased: burden of proof: waiver.

being proved, the seller had no right to base objection to his return upon the ground of this disease.

The defendant introduced considerable testimony tending to prove that the horse must have been infected with the disease, and must have had it in its incipient stage before it was purchased by him. The disease is rather an infrequent one in this country. It is frequently found in Belgium and France and other European countries. When found here, it is usually in imported horses. Crouch & Son were extensive importers. They were more or less familiar with the disease and had had experience with it. They had purchased this horse in Belgium about two months before he was sold to the defendant. The horse was a fine individual, and would weigh, in ordinary flesh, between 2,100 and 2,200 pounds. He was somewhat thin, however, when he was sold to the defendant. The defendant was never able to improve his condition as to flesh. He gradually lost weight until such loss amounted to over 500 pounds.

The defendant examined veterinary surgeons as witnesses. Their testimony all tended to show that the horse must have been in the incipient stages of this disease in 1909. One of these surgeons treated the horse in 1910. He testified to the apparent condition at that time. He also testified to his opinion that the sores upon the horse in 1910 were second or third year sores. They were too large for first year sores. None of this testimony was directly disputed. It is not incredible that an experienced veterinary surgeon could form reliable judgment as to the approximate time a progressive disease had run at the time of his observation of it.

There is evidence also by the defendant of various symptoms and scars observed by him immediately after the purchase, the significance of which, however, was not appreciated by him at the time. One of these was the condition of the horse's flesh, to which we have already referred. Others were small scars upon the skin which could have been the result of earlier sores.

We think the evidence was sufficient to go to the jury on the question whether the horse was diseased at the time of the sale. If yea, then, as already indicated, the advanced stages of the disease would not justify the sellers' refusal to take back the horse in accordance with the conditions of the guaranty, and such refusal amounted to a waiver of conditions.

2. Was there sufficient evidence to go to the jury on the question of false representations? Plaintiff testified to oral representations to the effect that the horse was sound and healthy and a sure foal getter. The evidence, therefore, is abundant to show the fact of representations, and that the representations were not true. Whether Crouch & Son knew the falsity of the representations is not shown by direct evidence. Reliance is had here upon various circumstances. Crouch & Son were experienced importers of horses, and were more or less familiar with the disease under consideration here. They had had previous litigation over the sale of a horse wherein the same disease was involved. In so speaking, we only assume the truth of the evidence on behalf of the defendant for the purpose of the discussion.

4. SALES: false representations: scienter: sufficiency of evidence.

If it should be found from the testimony already referred to that the sores appearing in 1910 were second or third year sores, then the diseased condition of the horse must have been apparent to an experienced observer in the summer of 1909. Crouch & Son had possession of him for two months or more. The horse was not actually delivered to defendant at the time of sale. Crouch asked to retain the horse in order to exhibit him at the horse show in Chicago in December. For that purpose, he expected to improve his condition and increase his flesh. When December came, the condition of the horse had not improved and he was not exhibited. This was a disappointment to the defendant. The reason given by Crouch for the failure to prepare the horse and to exhibit him was that he thought it would be better for him not to increase his flesh.

In the shape which the case has taken under the record, the question of *scienter* is not of controlling importance. If the defendant is entitled to prevail on the ground of false representations, he is likewise entitled to prevail on the ground of breach of warranty, provided he shows that the horse was in fact diseased when he bought him. In view of the fact that the condition of the horse, if diseased, could and ordinarily would have been observed by Crouch & Son when they had him, and perhaps ought to have been observed before they put him upon the market, we think the evidence as a whole was sufficient to go to the jury also on the question of *scienter*.

3. Was the note sued on acquired by plaintiff in good faith and in due course, within the meaning of the Negotiable Instrument Act; and upon which party is the burden of proof upon such question? Concededly, if the note was obtained by false representations, the burden of proof was on the plaintiff. Again, if Crouch & Son negotiated the note for the purpose of preventing a defense thereto, such negotiation thereof was a fraud upon the defendant within the meaning of the Negotiable Instrument Act. Such fraud would cast the burden of proof upon the plaintiff. Sec. 3060-a55, Code Sup.; *Bank of Bushnell v. Buck Bros.*, 161 Iowa 362. Many circumstances are shown which tend to prove such fact. The note was negotiated on July 19, 1911, only twelve days before maturity. Two installments of annual interest were past due and unpaid. It was received by the plaintiff as collateral to a note for $15,000 then executed by Crouch & Son. Such note was given for a loan of like amount. The proceeds of the loan were placed to the credit of Crouch & Son in the plaintiff bank. When it was checked out does not appear.

The note in suit was negotiated to plaintiff under a contract between it and Crouch & Son, whereby Crouch & Son agreed to bear all expense of litigation. Such contract, how-

5. BILLS AND NOTES: title of payee defective: negotiation to avoid defenses: effect on indorsee: burden of proof.

ever, had been in force between such parties for several years, and many notes had been purchased thereunder, and considerable litigation had been conducted by the plaintiff bank thereunder on other notes. In such litigation, it encountered defenses similar to those in the case at bar. It was familiar with the business of Crouch & Son and knew that their notes represented purchase price of horses sold, and that more or less litigation resulted to them.

J. Crouch & Son was a partnership consisting of father and son. The father was a director in the plaintiff bank. No officer in the bank, other than director Crouch, had any knowledge of defendant Grigsby, nor was any inquiry made concerning his solvency or otherwise. The cashier of the plaintiff testified that he alone transacted the business for the plaintiff in the purchase of such note, and testified to his good faith and want of knowledge of any infirmity. The burden of proof being upon the plaintiff at this point, the credibility of the cashier was fairly a question for the jury, to be determined in the light of the circumstances here indicated. The case at this point is quite controlled by our previous holdings: *Bushnell v. Buck Bros., supra; Iowa National Bank v. Carter,* 144 Iowa 715, 722; *Arnd v. Aylesworth,* 145 Iowa 185, 191; *McNight v. Parsons,* 136 Iowa 390, 399; *Bennett State Bank v. Schloesser,* 101 Iowa 573; *Commercial Bank of Essex v. Paddick,* 90 Iowa 63, 66; *Frank v. Blake,* 58 Iowa 750; *City Deposit Bank v. Green,* 130 Iowa 384; same case, 138 Iowa 156, 161. To the same effect, see the following from other jurisdictions: *Citizens Sav. Bank v. Houtchens,* 116 Pac. 866; *Johnson County Sav. Bank v. Rapp,* 91 Pac. 382; *Bank v. Walker,* 72 Atl. 579; *New England Mortgage Sec. Co. v. Gay,* 33 Fed. 636, 649; *Shellenberger v. Nourse,* 118 Pac. 508; *Bluthentahl v. Columbia,* 57 So. 814; *Winter v. Nobs,* 24 Ann. Cases 302, 304, 305; *Parsons v. Jackson,* 99 U. S. 434; 7 Cyc. 953; *Ireland v. Scharpenbery,* 103 Pac. 801; *Nat'l Bank v. Kirby,* 108 Mass. 497; *Merchants Nat'l Bank v. Wadsworth,* 131 N. W. (Mich.) 1108; *Union*

*Nat'l Bank v. Mallioux,* 132 N. W. (S. D.) 168, 174; *Citizens Sav. Bank v. Couse,* 124 N. Y. Supp. 79; *City Nat'l Bank v. Winsor,* 133 N. W. (Minn.) 961; *Park v. Winsor,* 132 N. W. (Minn.) 264. .

The Negotiable Instrument Act is intended to give negotiability and mobility to commercial paper, and, therefore, to extend protection to innocent holders thereof in good faith and in due course. But it is not intended as an aid or shelter to the creation of a litigating agency. If, therefore, the note was negotiated to avoid defenses thereto, and the purchaser had notice, the statute affords it no protection.

We do not overlook the fact claimed on behalf of plaintiff and the payees that the defendant had not threatened to make defense, at any time prior to the transfer of the note, but that he had asked for an extension of time. The plaintiff is entitled to the benefit of this circumstance before the jury, but it is by no means so conclusive as to entitle it to a directed verdict.

If the jury should fail to find any fraud either in the inception of the transaction or in the negotiation of the note to avoid defense, then the burden would rest upon the defendant to show that the plaintiff was not a good-faith holder in due course. Even from that point of view, we are convinced that the circumstances shown are sufficient to carry the question to the jury.

For the reasons indicated, the order directing a verdict for the plaintiff was erroneous. The judgment entered thereon must, therefore, be—*Reversed.*

Ladd, C. J., Weaver and Preston, JJ., concur.