GERMAN AMERICAN NATIONAL BANK, Appellant, v.
O. L. KELLEY et al., Appellees.

**BILLS AND NOTES:** Bona-fide Purchasers—Fraud in Inception of Note—Burden of Proof. The *uncorroborated* denial, by the cashier of a bank, of notice of a defect in the original title to a negotiable instrument purchased by the bank through him, does not *conclusively* establish such want of notice. In such cases, material considerations are:

1. Whether other bank officers charged with duties pertaining to such matters might have had notice.

2. Whether the purchase was a departure from the ordinary business methods of the bank.

3. Whether the time, place, and circumstances of the purchase were *somewhat* unusual.

SALINGER, J., dissents as to the applicability of the principle to the facts of the case at bar.

**EVIDENCE:** Opinion Evidence—Conclusion—Knowledge of Another. An assertion by a witness that a bank had no notice of any infirmity in the original title to a note which the bank had purchased, is a pure conclusion.

*Appeal from Cedar Rapids Superior Court.*—C. B. ROBBINS, Judge.

APRIL 2, 1918.

ACTION to recover judgment on a promissory note. The defense was that there was fraud in its inception, and that plaintiff acquired it subject to such infirmity. The issues were submitted to the jury, and verdict returned for defendants, on which judgment was entered. The plaintiff appeals.—*Affirmed.*

*Blake & Porter,* for appellant.

*Barnes, Chamberlain & Randall,* for appellees.

LADD, J.—On August 4, 1913, the defendants, O. L. Kelley and C. O. Sprague, executed their promissory note for $2,000 to the Western Implement and Motor Company.

1. BILLS AND NOTES: bona fide purchasers: fraud in inception of note: burden of proof.

Thereafter, the payee therein transferred said note to the Diamond Iron Works, and the latter to the German American Bank, plaintiff herein, all prior to the maturity of said note. The consideration for the execution of the note was $2,000 par value in preferred stock, and $1,000 par value in common stock, of the Western Im-

plement and Motor Company. The record leaves little or no doubt that the sale and the execution of the note were induced by fraud. At any rate, that issue was for the jury.

Assuming, then, that the promissory note sued on was procured by fraud, title thereto was defective, within the meaning of Section 3060-a56, Code Supplement, 1913:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

A holder in due course would hold the instrument free from such defect, and in the hands of any other, it would be subject to the same defenses as though non-negotiable. A holder deriving his title through a holder in due course, not tainted with the fraud or illegality alleged, also is a holder in due course. Section 3060-a58, Code Supplement, 1913.

"When it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course." Section 3060-a59.

No evidence bearing on the issue as to whether the Diamond Iron Works acquired notice of the defect in the payee's title when or prior to obtaining the note was adduced, and the sole question here presented is whether the evidence showed conclusively that the plaintiff bank was without actual knowledge of the infirmity or defect, or of such facts that its action in taking over the note might not have amounted to bad faith. To ascertain this, the evidence must be resorted to. One Stegner testified that he, as cashier of the bank, purchased the note October 13, 1913, in the usual course of business, and caused to be entered to the

credit of the Diamond Iron Works the face value of the note, together with accrued interest; that the same was subsequently checked out; that the note was thereupon entered in the bank's register of discounts and notes; that the bank had a president, two vice-presidents, and an assistant cashier, besides himself as cashier; that there were fourteen directors, and the entire number composed the discount committee; that the bank had no "subcommittee to take care of discounts, no credit man other than the officers;" that he had no conversation with any of the officers of the bank with reference to this note before it was discounted; that he knew nothing of it until presented by the Diamond Iron Works; and that what he had stated was all that occurred that day; that the Diamond Iron Works had been a customer of the bank for eight or ten years, and permitted to overdraw their accounts, "from time to time without interest;" that the makers of the note were not customers of the bank; that he had not met either of them, "did not know where they lived, but felt they lived at Cedar Rapids, Iowa;" that he made no inquiry with reference to them, further than this:

"In taking a note for discount, we always made inquiry regarding what the responsibility of the makers, and while I have no recollection of any figure being given me as to their responsibility, nevertheless the Diamond Iron Works gave me to understand that both Kelley and Sprague were very responsible."

He testified further that he had some conversation with an officer of the Diamond Iron Works when the note was presented, and could not say who presented the note, and made no further inquiry with reference thereto; that the bank did "not make a practice of buying the paper of a man living several hundred miles away without inquiry;" that he made no inquiry about the Western Implement and Motor Company; and that the Diamond Iron Works had a spe-

cific line of credit at the bank, and "I relied on their endorsement."

One Bleecker testified to having been a director and attorney of the bank for many years; that he was familiar with the duties of the several officers; that the cashier had charge "of all discounts coming from customers, and the president devoted time more particularly to the purchase of commercial paper outside of the bank's customers," as the bank always had more funds on hand than its customers required, and "over a million dollars are kept invested in outside paper, which is bought of brokers and others, and the president gives his attention to real estate mortgage loans largely."

"Q. Then Mr. Gross, as president, is not superintendent of the discounting of the notes such as this Kelley and Sprague note? A. No, such customer as the Diamond Iron Works and their trade paper that comes in—the customers' trade—goes to Mr. Stegner, who makes those loans and accepts those discounts."

He testified further that the discount committee goes over the notes once a month, at the directors' monthly meeting.

"Q. Then the custom of the bank was that these matters should be left wholly to the cashier of the bank, Mr. Stegner? A. Yes, sir."

On cross-examination, the witness testified that the president was in daily attendance at the bank; that both he and the cashier were accessible to customers, and that the Diamond Iron Works "could have had access to him;" and that the president performed duties stated, and was the superior officer to the cashier and assistant cashier. In the absence of the president and cashier, especially during the noon hour, the assistant cashier was in charge of the bank, though not authorized to pass on discounts or purchase papers.

Such was the evidence, and it is first to be observed that the cashier was in no manner corroborated in what he testified in relation to want of knowledge concerning the infirmity inhering in the note.

It is equally clear that such knowledge might have reached the bank through the president or the assistant cashier, both of whom were dealing actively with the public in behalf of the bank, and no evidence negativing the possession of such knowledge by these officers was adduced. No consideration is to be accorded Stegner's assertion that the bank was without notice; for, in the nature of things, that was a mere opinion. *Bennett State Bank v. Schloesser,* 101 Iowa 571.

2. EVIDENCE: opinion evidence: conclusion: knowledge of another.

The cashier was unable to state from whom he obtained the note, otherwise than that he was a representative of the Diamond Iron Works, and was without acquaintance with defendants, who resided in a city in another state, as did the payee and endorser. Moreover, the bank did not follow its practice of not dealing in paper the makers of which lived a long ways off, save upon making inquiries. Is such a showing so conclusive that fair-minded men could have drawn no other inference than that the plaintiff bank acquired the promissory note without knowledge of the fraud practiced on defendants, and also without knowledge of such facts as that, if taken as true, it must have acted in bad faith? It must have been so in order to have warranted the court in directing a verdict for plaintiff.

The rule which obtains in such a case is well stated in *Arnd v. Aylesworth,* 145 Iowa 185:

"Whether plaintiff has sufficiently satisfied the burden resting upon him and made good his claim to be an innocent purchaser is, therefore, a question for the jury, save in those instances where the testimony is not only consistent with the good faith of such purchase, but is such that

no fair-minded person can draw any other inference therefrom. A categorical denial of notice or knowledge is something which, in many, if not in most, instances, cannot be opposed by direct proof; and the credibility of the witnesses, their interest in the case, the reasonableness or unreasonableness of their statements, the time, place, and manner of the transaction, its conformity to or its departure from the ordinary methods of business, and all the other facts and circumstances which, though of slight moment in themselves, yet, when taken together, give character and color to the purchase, * * * constitute a showing which the court cannot properly pass on as a matter of law."

Previously, in *McNight v. Parsons,* 136 Iowa 390, this court had said:

"The testimony of the cashier of the bank that he or the bank purchased the note for value before maturity, even though he be not disputed by any other witnesses to the transaction, is not necessarily sufficient to enable the court to say, as a matter of law, that he received it in good faith. Such evidence does not negative notice or knowledge on part of other officers of the bank. Moreover, the bank being an interested party, the credibility of the testimony of the cashier was a matter for the jury to pass upon, in the light of all the facts and circumstances surrounding the matter under inquiry."

And as following these decisions, see *Bank of Bushnell v. Buck Bros.,* 161 Iowa 362; *Merchants Nat. Bank v. Grigsby,* 170 Iowa 675, and cases cited. See also *Farmers & Merchants State Bank v. Shaffer,* 172 Iowa 173.

Nothing to the contrary is to be found in *Des Moines Sav. Bank v. Arthur,* 163 Iowa 205, and *Robertson v. United States Live Stock Co.,* 164 Iowa 230. These last named causes were heard *de novo* in this court, and in each the purchaser of the negotiable instrument in question was found to have acquired it without notice of its infirmity.

Whether an issue of fact was presented, such as must have been submitted to a jury, was not discussed in either case. Indeed, the *Robertson* case distinctly recognized the law as settled that the uncorroborated denial by the cashier of a bank of notice of a defect in the title to a negotiable instrument purchased by a bank through him does not justify the direction of a verdict in its favor, but points out that, notwithstanding this, other evidence may be adduced or circumstances shown such as to exclude any other conclusion. No one could well controvert this. The trouble in the case at bar is that no such evidence was adduced or circumstances shown. On the contrary, knowledge by the president, in active control of the bank, and that of the assistant cashier, when in sole charge of the bank, was not negatived, and the circumstances were not such as to aid in establishing the *bona fides* of the transaction. The evidence was not such as to warrant a direction of a verdict for plaintiff, but was rightly held to be such as to carry the issues to the jury.—*Affirmed.*

PRESTON, C. J., EVANS, GAYNOR, and STEVENS, JJ., concur.

SALINGER, J. (dissenting). I. It seems to me the conclusion reached by the majority is unattainable upon the facts which the majority sets out.

Were it decided by *McNight v. Parsons*, 136 Iowa 390, that good faith is a jury question merely because the cashier gave the testimony, such a rule can certainly not be followed to its logical end. If it may, then no verdict can ever be directed, though the testimony of the plaintiff is uncontradicted. The mere fact that such testimony is given by the plaintiff would prevent a directed verdict for plaintiff. If that testimony is given by the cashier is sufficient impeachment to send a case to the jury, it cannot be explained why the direction of a verdict for a bank that bought negotiable

paper was ever sustained. Ordinarily, the testimony to want of notice and good faith must come from someone who has some managerial position in the bank. So if all that is needed to make cases of buying paper jury cases is that the cashier or buyer gave such testimony, then there was never any occasion to formulate rules as to when such cases were not for the jury. No such rules need be made, because no such case could exist. I think that, since it must be conceded that the testimony of the buyer *may* warrant a directed verdict in his favor, it cannot be the law that the case must always go to the jury because the testimony for the bank is given by its cashier.

II. The opinion discloses there was undisputed testimony that such discounts as are involved in the case we have were wholly for the cashier, and that the president of the bank did not deal with such discounts. It is shown without dispute that it was "the custom of the bank that these matters should be left wholly to the cashier." Though it is not disputed that, when a corporation leaves certain matters to a particular officer, other officers need not testify to want of notice and the presence of good faith, yet that rule is disregarded by the majority; and the opinion defeats the bank because its officers other than the cashier did not testify. The only attempt at explanation why this is done though the rule in question is adhered to, is, in effect, that the president of the bank and still others were active, constantly present, and that customers could have access to these other officers. It is further pointed out that an assistant cashier was in charge of the bank during the noon hour, though it is conceded he was not authorized to pass on discounts or to purchase paper. If the cashier was the officer who alone dealt with such discounts as the one in this case, I am at a loss to understand how it matters that others were his superior officers, and were active and present and accessible. The reasoning of the majority at this

point is simply a *non sequitur*. If, under the law, notice
to the bank could be given only through the cashier, and if
his good faith was the good faith of the bank, how does it
matter that the president did not disclaim notice nor testify
to his own good faith? How is it important that an as-
sistant cashier had charge of the bank at the noon hour,
when it is conceded that he had no authority to discount
or purchase paper? How does it matter that a discount
committee goes over the notes once a month, at the month-
ly meeting of the directors? I take it that the directors'
committee did not get to the notes in suit here until after
the cashier had bought them. How does it matter that the
president and the assistant cashier were dealing actively
with the public in behalf of the bank, since the transaction
before us was one that they were not in charge of?

Next, comes the remarkable statement that it should
be observed "the cashier was in no manner corroborated in
what he testified in relation to want of knowledge concern-
ing the infirmity inhering in the note." When was it ever
held before that want of knowledge and the presence of
good faith must be submitted to the jury unless the person
testifying on these heads was corroborated? How could
he be corroborated? When he says he had no notice, he
testifies to a negative necessarily resting in his own knowl-
edge. When he testifies that he acted in good faith, he
speaks to what necessarily rests in his own knowledge, and
involves the state of his own mind. It is clear that, though
he testifies he had no notice and acted in good faith, yet tes-
timony might impeach such statement. But how can it
possibly be corroborated? Is someone other than the cash-
ier to testify that the cashier had no notice, and acted in
good faith? If it were attempted, it would not be per-
mitted.

III. Next, and finally, affirmance is proposed because
the cashier did not know the makers; that he felt they lived

at Cedar Rapids; and that he made no inquiry with reference to them further than this. At this point, then, the majority proceeds on the theory that a jury case is made whenever inquiry does not go as far as it might, and is not pursued to a point which might have disclosed an infirmity in the paper. This overlooks that negligence is not material; that failure to make inquiry is not material, unless there be evidence that inquiry was purposely and in bad faith abstained from. It will not send notice to the jury if all appears is that mere ground of suspicion was known to the buyer, or that he was negligent. (*Arnd v. Aylesworth,* 145 Iowa 185, at 189), or that all that appears is that no inquiry was made to ascertain the existence of possible defenses *(First Nat. Bank of St. Thomas v. Flath,* 10 N. D. 275 [86 N. W. 867]). The paper is not impeached merely because the buyer is put on suspicion, and was careless as to making inquiry. *Lehman v. Press,* 106 Iowa 389. It will not send good faith to the jury where no more appears than that there was knowledge of suspicious circumstances. *First Nat. Bank of St. Thomas v. Flath,* 10 N. D. 275 (86 N. W. 867). It is not sufficient that " the circumstances were such as to invite inquiry" (*Lake v. Reed,* 29 Iowa 258, *Sinkler v. Siljan,* 136 Cal. 356 [68 Pac. 1024]), nor that there are facts and circumstances which should put a reasonable man upon inquiry *(Collins v. Gilbert,* 94 U. S. 753), nor that there was failure to make such inquiry as common prudence dictated *(Lake v. Reed,* 29 Iowa 258), —and this is so, though pursuing such inquiry would have discovered an infirmity (*Central State Bank v. Spurlin,* 111 Iowa 187),—nor that there was a want of diligence in making inquiry, and the note was taken under suspicious circumstances *(Trustees of Iowa College v. Hill,* 12 Iowa 462). The authorities expressly negative any obligation on part of the holder to prove diligence in ascertaining, and the holder is charged with the infirmity only where bad

faith is shown. *Voss v. Chamberlain*, 139 Iowa 569, 577. It would seem, then, that no case was made for the jury because the plaintiff bank did not inquire beyond what it did. Now, after having made a case for the jury because no inquiry was made, or because inquiry was not sufficiently pursued, we find it disregarded that inquiry was, in fact, made. When that is passed, the majority next bases its opinion on an imagined departure from a custom to inquire, the warrant being testimony that the bank did not make a practice of buying the paper of a man living several hundreds of miles away, without inquiry. At this point, it is again overlooked that inquiry was made. And the testimony is, further, that inquiry did not go as far as it might, because, the paper being a very small item in the relatively vast business of this bank, it was bought in reliance upon the endorsement of the seller, who lived in the town where the bank did business, and had a credit at that bank. I would reverse.