CENTRAL STATE BANK, Appellant, v. PEOPLES SAVINGS BANK OF BLAKESBURG, Appellee.

**BILLS AND NOTES:  Holdership in Due Course—Certificate of Deposit**
1  **Issued in Payment of Fraud-Induced Note.**  A negotiable certificate of deposit issued by an innocent party in payment of a fraud-induced note is subject, in the hands of an alleged holder in due course, to the plea (1) that the sale of the fraudulently·induced note and the securing of said negotiable certificate of deposit therefor *and the transfer thereof* formed part of a scheme to render the defense of said fraud unavailable, and (2) that the transferee of said certificate had knowledge of such facts when he purchased the certificate.

**BILLS AND NOTES:  Holdership in Due Course—Jury Question.**
2  *Holdership in due course is not ordinarily a question of law for the court.*  Record reviewed, and held to show such close co-operation between the manipulators of a fraud-induced note and the purchaser

thereof as to present a jury question on the issue of holdership in due course.

DE GRAFF, J., specially concurs.

**TRIAL: Instructions—Incorrect Request Suggesting Correct Principle.**
3  An incorrect request for an instruction may so clearly suggest the correct principle as to put the court on its guard and require it to properly cover the suggested matter in its instructions.

**BILLS AND NOTES: Holdership in Due Course—Instructions.** An
4  alleged holder in due course of a negotiable promissory note has a right, on request, to instructions which will correctly elucidate the principle that knowledge on the part of a purchaser of a negotiable instrument of circumstances which might put an ordinary person on inquiry does not necessarily deprive such purchaser of the standing of a holder in due course.

**BILLS AND NOTES: Holdership in Due Course—Erroneous Double**
5  **Burden.** The court should not instruct that an alleged holder in due course must show that he had no notice of any infirmity in the instrument *and that he bought said instrument in good faith.* The last clause suggests an erroneous double burden.

*Appeal from Wapello District Court.*—SENECA CORNELL, Judge.

JUNE 22, 1923.

ACTION at law to recover upon four several certificates of deposit issued by the defendant bank to the Associated Packing Company and indorsed in blank by the treasurer of said company. The plaintiff claims to be the holder of said paper in due course by purchase before maturity. No part of said certificates has been paid. The defendant denies the alleged indebtedness, and says that the certificates were obtained by fraud and collusion, and without consideration. There was a verdict and judgment for defendant, and plaintiff appeals.—*Reversed.*

*George E. Brammer, Brammer, Lehmann, Seevers & Hurlburt,* and *McNett & McNett,* for appellant.

*Gillies & Daugherty* and *Jaques, Tisdale & Jaques,* for appellee.

WEAVER, J.—This controversy has its origin in the following

transaction: The Associated Packing Company, an alleged corporation for pecuniary profit, sold shares of its capital stock to certain subscribers, who executed promissory notes to such company for the purchase price. The notes thus procured were by said company sold to the defendant, Peoples Savings Bank. Instead of paying for said notes by an immedi- ate transfer or delivery of the consideration in cash, said bank issued and delivered to the company certificates of deposit, payable at specified dates in the future. Thereafter, and before said certificates matured, the packing company sold and transferred them by blank indorsement to the plaintiff, Central State Bank, and, payment thereof being refused by the defendant, this action was brought to enforce collection. Defendant admits issuing the paper, but denies liability thereon, alleging affirmatively that the packing company was a fraudulent organization; that the notes obtained for its stock and sold to the defendant were obtained by fraud, and wholly void and uncollectible; and that, by reason of its close business relations and general knowledge of the real character of said company, plaintiff took said certificates charged with notice of their fraudulent character, and is not entitled to be regarded as a holder in due course.

*1. BILLS AND NOTES: holdership in due course: certificate of deposit issued in payment of fraud-induced note.*

At the conclusion of the evidence offered, plaintiff moved for a directed verdict in its favor, for the reason, variously stated, that the good faith of the plaintiff in the purchase of the certificates had been established as a matter of law, and that the evidence is insufficient to sustain a finding of any fraud invalidating the instruments sued upon. The motion was denied, the issues submitted to the jury, and verdict returned for the defendant.

The evidence as set out in the abstracts goes into voluminous detail of the organization of the packing company and its manner and methods of business, including the alleged schemes and devices employed by its officers and agents in promoting subscriptions to its capital stock. We shall not attempt to restate the story here. It is sufficient for the purposes of this appeal to say that the development and history of the enterprise are redolent with the atmosphere of fraud; and if the issue to be decided were one joined between the packing com-

pany and the duped purchasers of its stock, its solution would not be at all difficult. There are, however, other elements in the problem now submitted to us, as between the plaintiff bank and defendant bank. Neither of these institutions had any direct interest in the packing company. As banks, dealing in commercial paper, there is no reason why, acting in good faith and with due regard for the rights of others, they or either of them could not lawfully buy or sell the negotiable instruments offered by a customer in the usual course of business or trade, and be protected therein by the rules and principles embodied in the statute. For example, subject to the recognized limitations, the defendant bank could rightfully take title to promissory notes given to the company for its stock, and could rightfully issue its certificate of deposit therefor; and it was equally within the rights of the plaintiff bank to accept a transfer of such certificates and enforce collection thereof, without regard to the equities, if any, existing between the packing company and makers of the notes, or between the packing company and defendant bank. That right, as we have already intimated, is hedged about by certain limitations. It is provided for and available only to a holder of negotiable paper in due course. In the absence of other evidence, "every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course." Section 3060-a59, Code Supplement, 1913. If such burden is not satisfied, "a negotiable instrument is subject to the same defenses as if it were nonnegotiable." Section 3060-a58, Code Supplement, 1913.

"The title of a person who negotiates an instrument is defective within the meaning of this act when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud." Section 3060-a55, Code Supplement, 1913.

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the per-

son to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.'' Section 3060-a56, Code Supplement, 1913; *Arnd v. Aylesworth,* 145 Iowa 185.

But if the instrument ''is complete and regular upon its face,'' and the holder obtained it ''before it was overdue, and without notice that it had been previously dishonored,'' and he ''took it in good faith and for value,'' and if, ''at the time it was negotiated to him, he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it,'' then he is a holder in due course, within the meaning of the law (Section 3060-a52, Code Supplement, 1913) ; and the defenses, if any, which could be asserted against it by the maker as against the original payee are not available against such holder. It appears to be conceded in argument that the certificates of deposit are negotiable in form, and that they were transferred by the packing company to the plaintiff before maturity. The question left for consideration is whether, at the time of such negotiation there was any defect in the packing company's title to said paper; and if this be answered in the affirmative, there follows the further inquiry whether the plaintiff has satisfied or discharged the burden of proving that it acquired the title in due course, as provided by the statute, Section 3060-a59, Code Supplement, 1913.

It is charged by the defendant, and the testimony tends to prove, that the promissory notes procured by the company and delivered to the defendant in exchange for the certificates were tainted by fraud in their inception, and were without value,—a fact which, if established, would afford a complete defense to an action upon said paper in the hands of the payee. So, too, if the notes were converted into certificates of deposit and the certificates were negotiated, to avoid defenses thereto, and the purchasers had notice of such purpose, such transfer was not in due course, even though made before maturity and for full value. That there was evidence tending to show such fraud on part of the packing company can hardly be denied. Whether the plaintiff took such title in good faith

2. BILLS AND NOTES: holder-ship in due course: jury question.

and without notice of the fraud is an issue of fact, on which the parties were entitled to go to the jury. Quite in point is the comparatively recent case of *Merchants Nat. Bank v. Grigsby,* 170 Iowa 675. The issue there tried was in many respects quite parallel with the one now before us. There the note sued upon was negotiated before due, the purchase being made, as in this case, by the cashier of the bank, who alone transacted the business, and who testified unequivocally to his entire good faith and want of notice of the alleged fraud. Speaking by Evans, J., we there held that the trial court erred in directing a verdict for the plaintiff, saying:

"The burden of proof being upon the plaintiff at this point, the credibility of the cashier was fairly a question for the jury, to be determined in the light of the circumstances here indicated. The case at this point is quite controlled by our previous holdings." *Bank of Bushnell v. Buck Bros.,* 161 Iowa 362; *Iowa Nat. Bank v. Carter,* 144 Iowa 715, 722; *Arnd v. Aylesworth,* 145 Iowa 185, 191; *McNight v. Parsons,* 136 Iowa 390, 399; *Commercial Bank v. Paddick,* 90 Iowa 63, 66; *Bennett St. Bank v. Schloesser,* 101 Iowa 571, 573; *Frank & Darrow v. Blake,* 58 Iowa 750; *City Dep. Bank v. Green,* 130 Iowa 384; same case, 138 Iowa 156, 161; *Farmers & Merch. St. Bank v. Shaffer,* 172 Iowa 173; *Citizens Sav. Bank v. Houtchens,* 64 Wash. 275 (116 Pac. 866); *Johnson County St. Bank v. Walker,* 82 Conn. 24 (72 Atl. 579); *Johnson County Sav. Bank v. Rapp,* 47 Wash. 30 (91 Pac. 382); *Shellenberger v. Nourse,* 20 Idaho 323 (118 Pac. 508); *Parsons v. Jackson,* 99 U. S. 434; *Merchants' Nat. Bank v. Wadsworth,* 166 Mich. 528 (131 N. W. 1108); *Union Nat. Bank v. Mailloux,* 27 S. D. 543 (132 N. W. 168, 174); *Park v. Winsor,* 115 Minn. 256 (132 N. W. 264); *City Nat. Bank v. Jorden,* 139 Iowa 499.

See, also, *Goodman v. Simonds,* 20 How. (U. S.) 343, and discussion of the principle in *Connelly v. Greenfield Sav. Bank,* 192 Iowa 876, 879, and *German Am. Nat. Bank v. Kelley,* 183 Iowa 269.

While, as we have seen, notice of the defect in the title to paper negotiated before maturity is not to be presumed, nor is such fact established by showing that the buyer could have acquired such knowledge by ordinary diligence, yet the fact

of notice may be established by circumstantial evidence. *Haw-kins v. Young,* 137 Iowa 281, 283; *In re Estate. of Philpott,* 169 Iowa 555; *Merrill v. Hole,* 85 Iowa 66; *Perry Sav. Bank v. Fitz-gerald,* 167 Iowa 446, 455; *Cox v. Cline,* 139 Iowa 128; *Com-mercial Bank v. Paddick,* 90 Iowa 63; *Iowa Nat. Bank v. Carter,* 144 Iowa 715; *McNight v. Parsons,* supra; *First Nat. Bank v. Wise,* 172 Iowa 24; *Arnd v. Aylesworth,* supra; *Lundean v. Hamilton,* 184 Iowa 907, 913; *Connelly v. Greenfield Sav. Bank,* supra. See, also, citation from *Walters v. Rock,* (N. D.) 115 N. W. 511, 513, as approved by us in the *Carter* case, supra.

Without burdening this opinion with unnecessary details, it is proper to note, in a general way, the business and personal relations of the plaintiff bank with the promoters of the packing company, so far as they may afford any aid in making clear the merits of this controversy. The plaintiff is a bank organized and doing business at Des Moines, Iowa, with a capital of $250,000. Its principal officers were Simon Casady, chairman of the board; Grant McPherrin, president; John B. McDougal, vice-president; Leland Winsor, cashier; and J. W. Hawk and F. C. Ash, assistant cashiers. The work of promoting the organization of the packing company appears to have been largely in the hands or management of one R. H. Frisby, an alleged expert in the packing house business, and W. H. McDougal, father of John B. McDougal, vice-president of the plaintiff bank. A widespread and vigorous canvass was inaugurated for subscriptions to the capital stock through the solicitations of agents, who were to receive a commission of 25 per cent on sales made. McDougal was made treasurer, at $10,000 per year. The record of the dealings between the plaintiff bank and the packing company appears to have been opened in September, 1919, at which time the bank began purchasing from the company certificates of deposit made by other banks and issued in payment or exchange for promissory notes taken in payment of stock subscriptions. Transactions of this character were repeated at frequent intervals, down to within a few days of the appointment of a receiver for the company, in March, 1920. During that period, the plaintiff took by purchase from the packing company 131 certificates of deposit issued by banks in various parts of the state, aggregating about $171,000, in-

cluding the four now in suit. Nearly coincident in time with the beginning of these deals, Mr. McPherrin, president of the plaintiff bank, and Mr. Casady, chairman of its board, wrote letters of introduction over their official signatures, to various persons and correspondents, commending McDougal and Frisby to their confidence, as follows: McPherrin, under date of September 29th, says:

"We are intimately acquainted with Mr. McDougal, who is secretary and treasurer [of the packing company] and can recommend him as a careful and honest gentleman. Mr. Frisby, who we understand is to be general manager, was formerly connected with Armour and Company and we are informed made a success. We understand the company is to be capitalized for $5,000,000, and that they will invest considerable of it in the plant, but just how much we are not prepared to say."

To another, the same officer writes, saying:

"We think very well of the company at the present time. As to the future, we have no advice or prediction to make. It all depends on the management. We have confidence in Mr. McDougal, treasurer of the concern, and in Mr. Frisby, the manager."

To another, he writes:

"We have known Mr. McDougal intimately for a number of years. He is a man of high standing and enjoys the confidence of all who know him. I take pleasure in recommending Mr. McDougal to you with the thought that any statements made by him can be relied upon."

To another, he writes:

"Mr. McDougal is very well known to us. He is the father of J. B. McDougal, vice-president of our bank, and brother of J. B. McDougal, governor of the Federal Reserve Bank of Chicago. * * * He is a very honest, conscientious worker and we are sure any statements made by him can be relied upon."

On October 22, 1919, Mr. Casady, as chairman of the board, wrote, introducing McDougal as treasurer of the packing company and Des Moines Union Stock Yards Company, and saying:

"Any suggestions or assistance you may be able to render Mr. McDougal will be much appreciated."

To another he says:

"I beg to say this company is being organized by some very reputable men. They have a good reputation, have had long experience in this industry and should know how to run a concern of this character. I know nothing at all about the packing business and therefore cannot give you any opinion as to what they may do in the future. I would think, however, that a packing concern organized in the center of Iowa should be successful if successful anywhere. From your letter I take it you are buying notes given the packing company for stock. If the notes are good there should be no risk in your end of the business."

To another he says:

"The writer of this letter has known Mr. McDougal for a good many years and can bespeak for him the confidence of the business public and commend him as a gentleman who is very capable and is honest and trustworthy. I am quite sure all those who may have business relations with Mr. McDougal will be perfectly satisfied with their relationship with him."

In November of the same year, McPherrin, Casady, and John B. McDougal, with others, united in executing an application to the banking department of the state for the organization of a state bank, to be known as the Stock Yards State Bank, to be located at Des Moines, with a capital of $50,000, each of said persons to subscribe from five to ten shares of stock. For some reason not shown, the organization of the proposed bank was apparently never perfected.

Each of these letters bears a rubber stamp memorandum to the effect that "any statement on part of the Central Bank by any of its officers as to financial condition, standing and reputation of any person, firm or corporation as to the character or value of any securities is opinion only, and given in courtesy and for which no responsibility shall attach to the above named bank or any of its officers."

In putting these letters in evidence, Mr. McPherrin makes the written statement that "a man who could buy stock in this institution on the advice of letters such as we have written would be very foolish. Naturally we had confidence in Mr. McDougal and while Mr. Frisby was not so well known to us

we took Mr. McDougal's word for it that he was all he represented himself to be.''

If these letters were not intended to give standing to or inspire confidence in the men named and in the business enterprise they were promoting, it would be interesting to know why they were written at all. It is not necessary to find or believe that the writers acted in bad faith or consciously undertook to aid in the perpetration of a fraud on subscribers to the stock, and it is to be admitted that the letters were shrewdly and diplomatically phrased to avoid the assumption of legal liability for the promoters' fraud, if any there was; yet the natural effect thereof was to give character and prestige to the packing company and its promoters, and to add materially to the orgy of speculation in worthless shares of corporate stock which notoriously marked the history of Iowa during that period. Those conditions were not ''hidden under a bushel;'' and even if we concede the truth of the plaintiff's denial of actual notice of fraud in the inception of notes for which defendant issued or exchanged its certificates, we think it was still open to the jury to say by its verdict that the circumstances were such as to negative plaintiff's claim to have discharged the burden of showing its acquirement of the title in good faith.

It further appears that, early in the history of the promotion of the packing company, the plaintiff bank adopted the policy of refusing to purchase any of the notes taken by said company for stock subscriptions. The purchase of the certificates of deposit appears to have been made for the plaintiff by the vice-president, J. B. McDougal, upon conference with the president, McPherrin, and made with knowledge that the certificates had been given by defendant bank in consideration of stock subscription notes. It is fairly inferable that it was the policy of the packing company to avoid defenses to such notes by negotiating them in exchange for certificates of deposit, and then discounting the certificates of one bank for credit in another bank, or in exchange for other certificates, even at a lesser rate of interest, thereby foreclosing, so far as possible, the likelihood of successful defense thereto. The explanation offered that this shifting of securities was simply a method of converting the paper into ''liquid assets'' for immediate use is

hardly borne out by the record.  It there appears on the part of the defendant that it was ready, able, and willing to pay for the notes in cash, and would have done so if cash had been demanded; but that, instead thereof, these promoters asked for and obtained the certificates, which they proceeded at once to liquefy by an entirely unnecessary circumlocution.  These and other circumstances of like tendency with which the record is replete create a showing entitling the parties to the verdict of the jury upon the vital questions to which we have adverted, whether the title of the packing company to the certificates was defective, within the meaning of the statute, and if so, then whether the plaintiff has satisfied the statutory burden of proving its status as a holder in due course.  It is true that the defendant's officers deny categorically all knowledge of such defect; but such denial creates an issue of fact, and not of law. This is not, in fact or in effect, as counsel seem to believe, a holding or suggestion that "every plaintiff claiming to be a holder in due course is dishonest, or his testimony is untrue." It is the simple recognition of a settled rule of law that the truth, weight, and value of human evidence is a question for the jury, and not for the court.  Men of equal intelligence, integrity, and fairness may fairly differ in their judgments and findings upon any given showing.  True, if there be no conflict of evidence, and no fact or circumstances be shown to cast doubt or suspicion upon the *bona fides* of the transaction, and "no reasonable inferences may be drawn by the jury from the facts and circumstances surrounding the negotiation and purchase of the instrument, tending to show *mala fides,* then the court is justified in refusing to submit such question to the jury.  But the cases are rare, calling for such peremptory interference with the jury's functions."  See, also, *Anthony v. Mercantile Mut. Acc. Assn.,* 162 Mass. 354.

As we have already pointed out in *Merchants Nat. Bank v. Grigsby,* supra, the mere fact that notice is denied by the officers acting for the bank is not sufficient ground for directing a verdict.  In so ruling, we further said that the statute in question "is intended to give negotiability and mobility to commercial paper, and, therefore, to extend protection to innocent holders thereof in good faith and in due course.  But it is not

intended as an aid or shelter to the creation of a litigating agency. If, therefore, the note was negotiated to avoid defenses thereto, and the purchaser had notice, the statute affords it no protection.''

This ruling is repeated and reaffirmed in each of the many precedents already cited. The rule is too well and thoroughly settled to justify further question thereon.

Appellant has assigned numerous errors upon the trial court's charge to the jury. Many of these objections are made to bear upon propositions which assume as a matter of law the right of the plaintiff to recover, and to that extent are controlled by the conclusions we have already announced against the plaintiff's contention. There are, however, other criticisms advanced upon certain paragraphs of the charge which are more difficult of disposition. For example, appellant requested the court to instruct the jury as follows:

3. TRIAL: instructions: incorrect request suggesting correct principle.

''4. You are instructed that the mere knowledge of facts or circumstances sufficient to put a prudent man upon inquiry, without actual knowledge, or mere suspicion of an infirmity or defective title, does not preclude a transferee of negotiable commercial paper from occupying the position of a holder in due course, unless the circumstances or suspicions are so cogent and obvious that to remain passive would amount to bad faith. * * * You are further instructed that, where a false representation of a fact susceptible of knowledge is relied upon as constituting fraud, it must be shown by a preponderance of the evidence on the part of the one claiming to have been misled or defrauded that such representation was made knowingly, with intent to mislead, or that the party making such representation did make it recklessly, or did assert such representation as being true of his own knowledge, without having any reasonable ground for believing it to be true, and for the purpose of inducing the one claiming to have been defrauded, to act. * * *''

4. BILLS AND NOTES: holdership in due course: instructions.

In another request, referring to evidence of alleged fraudulent representations by the packing company or its representatives to persons solicited to become purchasers of stock, appel-

lant asked the court to charge that statements or expressions of opinion, as distinguished from statements of substantive fact, do not amount to actionable fraud. These requests were, perhaps, couched in terms more emphatic than the court would have felt justified in using; nevertheless they called attention to pertinent legal propositions upon which the plaintiff was entitled to have the jury informed, and we think that the charge as given did not contain the equivalent or substance of the matter requested. The assignment of error upon these omissions must be sustained.

Again, the court, in its charge, told the jury, among other things, that:

"The main questions for consideration at this point are: First, whether or not the plaintiff bank, at the time said certificates were negotiated to it, had notice of an infirmity in the instruments or defect in the title of the Associated Packing Company; and second, whether plaintiff took said certificates in good faith."

5. BILLS AND NOTES: holdership in due course: erroneous double burden.

Assuming, as we may, for the purposes of this appeal, that the jury could properly find that the title of the packing company to the certificates was defective, and that thereby the burden was cast upon the plaintiff to prove its status as a holder in due course, we are inclined to the view that the instruction here quoted is open to criticism, in that, having properly told the jury that plaintiff in such case must affirmatively prove that it had no notice of such defect in the title, the instruction seems to add to that burden the requirement of a further showing that it made the purchase in good faith. Now it is true that, with the burden upon plaintiff, it was required to prove its good-faith holding; but could not this be established by proof from which the jury should find that it took the paper without notice of the defect; and would not the jury be led by the second clause of the instruction to think that, to establish a right to recover, it was necessary for plaintiff to do more than to satisfy the burden of showing a want of notice of the defect? We are confident that the court did not intend to impose upon plaintiff a double burden in this respect, but the tendency of the direction as given was, to say the least, somewhat confusing.

Other instructions requested and refused were either clearly erroneous, or their substance, so far as correct, was sufficiently embodied in the charge as given.

For the reasons stated, a new trial must be granted, and for that purpose the judgment appealed from is reversed, and cause remanded.—*Reversed and remanded.*

PRESTON, C. J., and STEVENS, J., concur.

DE GRAFF, J., concurs specially.

DE GRAFF, J. (concurring specially.) I concur in the reversal of this cause. I do not subscribe to the doctrine that the letters of recommendation which the trial court permitted to be introduced are indicia of bad faith on the part of the bank or an officer thereof, nor do they prove or tend to prove collusion, nor should they be construed as a perpetration of a fraud on subscribers to the stock in consideration of which notes were given. If any inference relative to the issues involved may be drawn therefrom it is that the writers thereof had faith and confidence in the party recommended. It is far-fetched to predicate an assumption of legal liability on the part of the bank and to permit the letters to be considered as evidence of the alleged deceit of promoters and connecting the bank or an officer thereof with the pleaded fraud.

The facts and circumstances in relation to the letters in my judgment have no relevancy to the claim of a holder in due course. In brief this evidence does not cast doubt or suspicion upon the *bona fides* of the transaction and to so hold or to permit a jury to so speculate is in legal effect a holding that any recommender is not worthy of belief, forsooth he subsequently becomes a holder of commercial paper transferred by the person recommended or by some company or corporation represented by him in an official capacity.

The weight and value of human testimony is usually a question for the jury and not for the court. However, if the testimony of the holder of negotiable paper is not contradicted, his witnesses are unimpeached, and no reasonable or fair inferences may be drawn from the testimony tending to prove bad

faith on the part of the purchaser then it is the duty of a court to refuse a submission. This is such a case.

It is not the function of a court to permit a jury to enter a field of speculation and conjecture. To do so is to sap the vital juices of the negotiable instruments law. Negotiable paper is intended to circulate as money. It is a courier without luggage. Conflicting evidence and conflicting inferences must have a rational support in the record.

I cannot accept the limitations or the interpretations expressed by the majority opinion on several phases of the instant record. I do concur that the judgment entered should be reversed.