COMMERCIAL SAVINGS BANK OF WASHINGTON, Appellee, v. I. L. COLTHURST, Appellant.

**BILLS AND NOTES:** Holdership in Due Course—Jury Question. Holdership in due course of a negotiable promissory note is always a jury question when, on the issue of good faith, reasonable minds may draw different conclusions. So held where a jury question was presented because of the unusual and questionable method employed in paying for the note.

**BILLS AND NOTES:** Holdership in Due Course—Recovery by Indorsee With Knowledge. Principle recognized that the purchaser of a negotiable promissory note may recover thereon, irrespective of his

knowledge of fraud in the inception of the note, provided he purchases from one who was, in truth and in fact, a *holder in due course.*

EVIDENCE: Parol as Affecting Writings—Under Plea of Fraud. The
3 following instrument, executed by the maker of a negotiable promissory note, is, under a plea of fraud against the recipient and against a subsequent indorsee, subject to parol explanation as to what was said when the same was executed, viz.:

"It is satisfactory with me for you to accept my note dated Dec. 9, 1918, amounting to $8,000, and to make the customary settlement with [the payee of the note]."

*Appeal from Washington District Court.*—D. W. HAMILTON, Judge.

JUNE 23, 1922.

SUPPLEMENTAL OPINION .FEBRUARY 6, 1923.

REHEARING DENIED MAY 18, 1923.

ACTION to recover on a promissory note against the defendant-maker by plaintiff who claims to be a holder in due course. The court directed a verdict in favor of the plaintiff and judgment was entered accordingly. Defendant appeals.—*Reversed.*

*Morrison & Morrison,* for appellant.

*Livingston & Eicher* and *W. M. Keeley,* for appellee.

DE GRAFF, J.—This appeal concerns itself with the *bona fides* of the plaintiff bank in the negotiation and purchase of the note in suit. The trial court ruled that the bank was a holder in due course and at the close of all the testimony directed a verdict in its favor. Did the court err?

The note reads as follows:

1. BILLS AND
NOTES: holder-
ship in due
course: jury
question.

$4,000                                December 9, 1918

On or before one year after date I promise to pay to the order of myself at....................four thousand dollars for value received, with interest thereon at the rate of 6% per annum, from date.          I. L. Colthurst.
80c. I. R.  Stamps attached and canceled.
(Indorsed on reverse side) I. L. Colthurst.

This is a Daniel Hayes Company note. See *Farmers Sav. Bank v. Neel,* 193 Iowa 685. S. T. Lalor and other agents of the company commenced operations in Washington County, Iowa in the summer of 1918, and through their efforts certain contracts for the sale of lands located in Madera County, California were made with Washington County residents, including the defendant herein.

We deem it unnecessary to incumber this opinion with a recital of the fraudulent scheme of this company. It is sufficient to state that this note was one of several that were secured on contracts of sale by the land company through its agents and that the note in question was conceived in fraud and born of false representation.

The note is a negotiable instrument by virtue of the statute. Sections 3060-a1 and 3060-a8, Code Supplement 1913. It is bearer paper, and was transferred by the land company without indorsement to the First Savings Bank of Crawfordsville, Iowa and by that bank to the plaintiff bank without indorsement.

The evidence does not show that the Crawfordsville Bank was an innocent purchaser. It may not be said, therefore, that the plaintiff is a holder who derived his title through a holder in due course. Ibid 3060-a58. If the plaintiff bank is a holder in due course the instrument in its hands is free from any defect of title of prior parties and free from defenses available to prior parties. Ibid. 3060-a57. Every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he, or some person under whom he claims, acquired the title as a holder in due course. Ibid 3060-a59.

Section 3060-a52 of the Negotiable Instruments Law of Iowa defines a holder in due course, and this case must conform to the test therein prescribed. The note is complete and regular upon its face. The plaintiff bank became the holder thereof before the paper was overdue. Did the bank take the note in good faith and for value and without notice of any infirmity in the instrument or defect in the title of the person negotiating it? This is the pertinent question. The defendant maker having established that the title of all prior persons who negotiated the note

was defective for reasons stated in Section 3060-a55 (fraud in the inception and negotiation in breach of faith), it was incumbent upon the plaintiff by the express terms of Section 3060-a59 to prove that it acquired the title to said note in due course.

The trial judge ruled this case and directed a verdict on the ground that the plaintiff bank was a holder in due course. Did the facts present a jury question? Was the *bona fides* of the plaintiff bank under the circumstances and the reasonable inferences that could be drawn from the facts a question for the jury to determine? This court has said many times that ordinarily it is a question for the jury whether the holder of negotiable paper is an innocent purchaser. Each case must be bottomed upon its own facts. If it can be said that the testimony in a given case is not only consistent with the good faith of the purchaser, but is such that no fair-minded person can draw any other inference therefrom, then a court is justified in directing a verdict. *Arnd v. Aylesworth,* 145 Iowa 185.

In the recent case of *Edelen v. First Nat. Bank of Hagerstown* (Nov. 1921) 139 Md. 413 (115 Atl. 599) it is said: "The effect of the transfer to the plaintiff of the burden of proof upon a question of this nature is to make it incumbent upon him to prove the circumstances under which he acquired the instrument upon which he seeks to recover. If the evidence thus offered is uncontradicted, and the proven circumstances do not admit of a rational inference of knowledge or bad faith on the part of the plaintiff, the court may rightfully so instruct the jury. To adopt the contrary view would mean that, in every suit by an indorsee of a negotiable instrument affected by some original infirmity, the question as to whether the plaintiff acted in bad faith would have to be submitted to the jury, no matter how conclusively his good faith may be proven by the uncontradicted evidence. It is not the mere denial of knowledge by the plaintiff that entitles him to an instruction in his favor on such an issue. But the circumstances under which he took the note, and which he has the affirmative duty to prove after its fraudulent origin has been shown, must be wholly inconsistent with the theory that he was not guilty of bad faith in its acquisition. This is the theory upon which the decisions of this court in such cases have uniformly proceeded. In the cases in which

proposed instructions as to the legal insufficiency of the evidence to prove bad faith on the part of the plaintiff were disapproved, the reason assigned for such a ruling was not simply that the burden of proof was on the plaintiff as to that issue, but that there were circumstances from which bad faith could be inferred.''

The opinion cites cases which are in apparent opposition to the view expressed therein and as quoted supra, but it is pointed out that those cases involve conditions which gave support to the inference of bad faith in the plaintiff's acceptance of the negotiable instrument on which the suit was instituted.

If conflicting inferences may be drawn from the facts, viewed individually or collectively, then the jury must decide. A court may be justified in refusing to submit the question of good faith to the jury, but only in a case in which the evidence offered by the plaintiff holder is uncontradicted, his witnesses stand unimpeached, directly or circumstantially, and no reasonable or fair inferences tending to prove bad faith can be drawn by reasonable men from the facts and circumstances surrounding the negotiation and purchase of the instrument. *Johnson v. Buffalo Center St. Bank* 134 Iowa 731; *City Nat. Bank v. Mason,* 192 Iowa 1048.

It is not our thought or intent to state a precise rule that enables a trial court to make an instant and undisputed application to the facts in cases of this character. It would be idle to attempt to do so. The principle stated indicates the general test to be applied.

The only inquiry here is whether the plaintiff acquired the note without knowledge of the fraud in its origin or of its negotiation in breach of faith or of such facts as would subject it to the imputation of bad faith in the transaction.

Upon a careful consideration of the record we conclude that the case does not fall within the rule above stated. Under the facts and circumstances inferences could be drawn by reasonable minds impeaching the *bona fides* of the transaction. Different conclusions could be drawn by reasonable men. As was said in *Anthony v. Mercantile Mut. Acc. Assn.,* 162 Mass. 354; ''It is only when no inferences are possible except those which

lead to one conclusion that the jury can be required to find a proposition affirmatively established.''

In view of the necessity of ordering a new trial we refrain from expressing any opinion on the merits of the proposition involved but will briefly detail the evidence offered. At the time Colthurst signed the note under the fraudulent inducements of the Hayes Land Company it was agreed that this note should be left with the First Savings Bank of Crawfordsville on deposit for safe-keeping until the defendant had examined and had accepted or rejected the land described in his contract. In the event of rejection the note was to be returned to the defendant. This the cashier of the First Savings Bank well knew. In fact, he was on the pay roll of the Hayes Land Company and actually received $1.00 per acre on the deal. On the day following the deposit of the note with the Crawfordsville Bank the cashier went to the defendant's farm with a paper apparently prepared by him and which he induced Colthurst to sign. This paper was addressed to R. A. Dix cashier of the Crawfordsville Bank and read as follows: ''It is satisfactory with me for you to accept my notes dated December 9, 1918, amounting to $8,000 and to make the customary settlement with Mr. S. P. Lalor representative of the Daniel Hayes Company. Yours very truly.''

The undisputed testimony of Colthurst is to the effect that Cashier Dix asked him if he had signed ''these notes that had been brought in.'' He gave the cashier an affirmative answer and told him that the notes were to be left in his bank and in his care until the land was inspected and either rejected or accepted. The cashier replied that he understood the contract. Then Mr. Colthurst said: ''Mr. Dix, I depend on you to hold these notes, and not give me any trouble. I have confidence in you, or I would not have done this. I am depending on you to hold these notes until this land is inspected.'' There was nothing said at that time about Mr. Dix buying this note or any of the notes. We now pass to the transfer of the note to plaintiff.

The plaintiff bank was a long-time depositor of and closely affiliated with the Crawfordsville Bank from whom the note was purchased January 16, 1919. The deal was consummated by and between Cashier Dix of the Crawfordsville Bank and Vice

President Keck of the plaintiff bank. No other person had knowledge or notice of the exchange of paper at that time.

Colthurst had never been a regular client of the plaintiff bank although his financial standing was well known to the bank. He had had no dealings with the bank in 1919 and for many years prior thereto. The note was not stamped or canceled at the time of its execution and never was stamped or canceled by Colthurst. Just when and by whom this was done is not disclosed, but the stamps appeared thereon when the note was received by the plaintiff bank, as testified by witness Keck.

The purchase was not reported by Keck to the bank directors for about five weeks after the note was received by plaintiff and about three weeks after the exchange notes were sent in payment to the Crawfordsville Bank. Dix was not called as a witness but all the officers of the plaintiff bank were called and testified that they knew nothing at all about the matter until a later time.

Keck testified that the first intimation that he had of the desire of the Crawfordsville Bank in this matter was when cashier Dix phoned him and asked him if he wanted to buy a good piece of paper. ''I said we were not buying, and wanted to know the conditions. He said he had an excess loan, and that he wanted to reduce to his legal limit, was the reason for asking that the paper be taken; said it was a man I knew well, and no question but what the paper would be thoroughly secured. I told him to send it up, and I would handle it for him. When I told him we were not buying paper, he said he didn't care so much for that; it was only the excess loan, and he wanted to get down in the limit.''

The note was received later by mail but unindorsed by the Crawfordsville Bank. It is thus seen that the plaintiff bank was made the conduit through which the Colthurst note was negotiated. The capital and surplus of the Crawfordsville Bank was $25,000, and since the Colthurst notes exceeded the statutory limit of 20 per cent the plaintiff bank became the means whereby the notes were purchased by the Crawfordsville Bank from the agent of the Hayes Land Company.

Keck testified: ''It has been customary for me, while handling the business of correspondents for plaintiff, to purchase

from them their excess loans, and to take the paper without indorsement.  Indorsement would defeat the purpose that they have in asking my bank to carry it.  Where a correspondent bank guarantees the payment of the paper, it is charged against it by the banking department.''

This is what the plaintiff bank was doing for and on behalf of the Crawfordsville Bank in this instance and no record was kept in the plaintiff bank ''outside these notes.''  It was in fact a concealment of the transaction between the plaintiff bank and the Crawfordsville Bank and also a concealment of an excess loan on the part of the Crawfordsville Bank through the agency of the plaintiff bank.

On January 15, 1919, in the adjustment of matters relative to the purchase of the note in suit, and in speaking of the Thompson note of $3,000 which was one of the notes transferred to the Crawfordsville ·Bank, Keck wrote Dix: ''At times, he [Thompson] is quite a heavy borrower, needing amounts in excess of what the bank at Brighton can legally loan him; so that at times we are carrying his paper for the excess amount.''

What was given by the plaintiff bank through its vice president as value for the Colthurst note?  Three items constitute the payment therefor: (1) A Mr. Thompson's note held by the plaintiff bank for $3,000; (2) Mr. Keck's personal note of $1,000 given directly to the Crawfordsville Bank; (3) A credit of $19.50 on plaintiff's book for the benefit of the Crawfordsville Bank.  This last item measured the difference in the interest on the exchange of the paper.  The plaintiff bank did not own the Keck note.  It was sent as a trade or part trade for the note in suit.  Nothing was said to any officer or director about sending his personal note in the exchange of paper.

It further appears that a Mr. Wilcox sometime prior to the transaction desired to borrow $1,000 at the plaintiff bank but he did not have the proper legal security to give the bank.  Keck testified: ''I took $1,000 from the bank and gave Wilcox credit for it, and Wilcox gave me a note payable to myself.  In fact, I borrowed that money from the plaintiff bank.  I took out of the files of the bank the note belonging to the bank signed by A. G. Wilcox, and drawing 6 or 7 per cent interest, and took that over to myself.  I sent my own note down to the Crawfords-

ville Bank as a trade or part trade for the note in suit. I said nothing to any officer or director about the matter of buying or taking up the Wilcox note.''

It further appears that the loan committee of the plaintiff bank at the April 1916 meeting passed a recommendation or rule requiring selling banks to guarantee the paper taken from them, but no guarantee was taken from the Crawfordsville Bank at the time in question.

Furthermore Keck claims that on the Wilcox deal, which was also a violation of the rules of his bank, that it was in fact a loan of the bank's funds to himself. The statute expressly prohibits any Iowa bank to loan money to any officer or employee except upon the express order of the board of directors, made in the absence of the applicant, duly entered upon the records of the board proceedings. Code Section 1869.

The Wilcox note was not legally competent paper to be carried by the bank on account of the absence of proper security, yet it was carried through the efforts of its vice president as cash which had been loaned to Wilcox, and for which after the giving of his own personal note to the Crawfordsville Bank the value thereof was returned to the bank by the Colthurst note. We are inclined to think that from this part of the transaction alone inferences could be drawn by a jury tending to impeach the *bona fides* in the purchase of the note in suit. Clearly it was for the jury to say whether this evidence would impeach the credibility of witness Keck.

There are other incidents found in this record, some of which have been recited, which also tend to impeach his credibility. The other officers of the plaintiff bank merely claimed to know nothing about the transaction until the bubble burst.

We do not question the rule that the exchange of commercial paper constitutes a consideration. That the paper given by the plaintiff bank in exchange for the note in suit was intended by the purchaser to be payment and was accepted as such by the selling bank there is no dispute.

Under the instant record, the jury could find that the Thompson note and the Keck note were fully paid to the Crawfordsville Bank shortly after their maturity and this would tend to prove the value of said paper given in consideration for

the note purchased.   It is the value of the paper given in consideration at the time of the purchase, and the recited value of negotiable paper is not conclusive but prima-facie evidence of its value.

Negotiable paper is a commodity.   It is bought and sold. It has a market value dependent upon the assets and financial worth of the maker and indorsers, its rate of interest, time to run, etc.   Ordinarily what this value is constitutes a fact question.   In this connection it may also be said that the claim of $19.50 on plaintiff's books did not constitute a payment until it was withdrawn.   *City Deposit Bank v. Green*, 130 Iowa 384.

Upon the objection of plaintiff the court refused the right to the defendant to introduce the plaintiff's record of its open account with the Crawfordsville Bank, and there is no evidence that the money represented by this credit was ever withdrawn. The court could not say as a matter of law that the book credit constituted payment.

Since a reversal must be ordered it is unnecessary to lengthen this opinion by further recital.   Under the facts, and the inferences which may be properly drawn therefrom, the case should have been submitted to the jury and the court was in error in directing a verdict on plaintiff's behalf.   Wherefore the judgment entered is—*Reversed*.

STEVENS, C. J., WEAVER and PRESTON, JJ., concur.

SUPPLEMENTAL OPINION.

PER CURIAM.—Appellee on petition for rehearing strenuously contends that this court is in error in holding that under the record the First Savings Bank of Crawfordsville from whom the plaintiff bank purchased the note in suit was not an innocent purchaser.   It may have been inadvertently stated in the former opinion that "it is not claimed" that the Crawfordsville Bank was an innocent purchaser, but the mere claim, whether made or not, is not determinative of the issue. Appellee now predicates the innocence of the Crawfordsville Bank in the purchase of the note on Exhibit 5.   This is the document signed by the defendant Colthurst and addressed to R. A.

2. BILLS AND NOTES: holdership in due course: recovery by indorsee with knowledge.

Dix cashier of the Crawfordsville Bank, as recited in the opinion of this court.

It may be well to recite the pleadings that have to do with the particular question presented.

Defendant in his answer after pleading specific fraud in the procurement of the note in suit alleges in Paragraph 8 the following: "8. That any and all transfers or attempted transfers or negotiations of said instrument sued on, made by said Hayes Company or said First Savings Bank of Crawfordsville, Iowa, or any other of said conspirators and parties to said scheme to defraud this defendant, were made in breach of trust, and by and with the intent upon the part of all of said coconspirators or schemers by and with the collusion and co-operation of plaintiff bank fully to consummate said fraud upon this defendant, by placing said note, the signing and possession of which was so fraudulently obtained, as aforesaid, in the hands of an apparently innocent holder in due course, for collection of same from this defendant after defendant discovered the said divers frauds so practiced upon him.

That the inception of said instrument in suit was tainted by fraud, and same was never completed or delivered by authority of this defendant, was never regular upon its face, was negotiated or transferred in breach of faith, and that neither the plaintiff nor any other holder thereof ever was or is a holder thereof in due course."

Plaintiff in its filed reply in Count III thereof alleges the following: "That on or about its date the defendant delivered to said First Savings Bank the following writing:

To R. A. Dix, Cashier,                     December 10, 1918.
Crawfordsville, Iowa.
Dear Sir:

It is satisfactory with me for you to accept my notes dated Dec. 9th, 1918, amounting to $8,000.00 and to make the customary settlement with Mr. S. P. Lalor, representative of the Daniel Hayes Co.

Yours very truly,

I. L. Colthurst.

That said bank relied on said statement in buying the note in suit, and therefore defendant is estopped to defend.''

These pleadings must be construed in making answer to the questions which will be later suggested herein.

The claim of plaintiff bank as a holder in due course may be predicated upon one of two grounds, to wit: (1) that it derived its title through a holder in due course, which in this case is the Crawfordsville Savings Bank, or (2) that it derived its title in conformity to the provisions of Section 3060-a52 of the Negotiable Instruments Law.

It must be said that under the facts and circumstances disclosed by the record that a jury question is presented in the determination of the *bona fides* of the plaintiff bank, regardless of whether its title to the note is predicated either under (1) or (2).

Furthermore, if it may be said under the facts and circumstances of this case that the Crawfordsville Bank had such title to the note in question that it could not have been defeated by the defendant maker had suit been instituted by said bank against the defendant, then any notice which the plaintiff bank, as transferee, may have had of the fraud in the original transaction, does not defeat the rights plaintiff acquired by the transfer. In other words, if the Crawfordsville Bank, the transferor of plaintiff, was a bona-fide holder of the note and could have enforced it against the defendant, then the transferee, plaintiff bank, although it may have taken the note charged with notice of the infirmities therein, may recover in this action.

The stated principle is true by virtue of the provisions of the Negotiable Instruments Law and it has been repeatedly affirmed in judicial decisions. See *Simon v. Merritt,* 33 Iowa 537; *Mornyer v. Cooper,* 35 Iowa 257; *Green v. Wilkie,* 98 Iowa 74.

The difficulty in the instant case does not arise by reason of any principle found in the Negotiable Instruments Law. Stating the thought concretely, if it were not for the item of evidence, known as Exhibit 5, the judgment of the trial court should stand reversed. Exhibit 5 introduces a new element or principle not peculiar to the law of negotiability, but general in its application. This doctrine as pleaded is called estoppel.

The Crawfordsville Bank, as now claimed by plaintiff, purchased the note upon the strength of Exhibit 5. True the bank knew that the note was to be held in escrow until the maker Colthurst had inspected the land purchased by

3. EVIDENCE: parol as affecting writings: under plea of fraud.

him and either accepted or rejected by him. Prior to the examination of the land and while the note was in the Crawfordsville Bank Exhibit 5 was signed. In effect this writing authorized the bank to buy the note from the indorsee of the defendant maker and to make settlement with the indorsee.

Did this constitute such a waiver or estoppel on the part of the maker that had the maker been sued by the Crawfordsville Bank he would have been liable to pay? Stating the matter in another form, and in a way that constitutes the gist of the objection on the part of the plaintiff bank: May this document Exhibit 5 be impeached? May the parol evidence rule be invoked by plaintiff when defendant attempts to introduce evidence to explain, vary, or contradict the meaning of said instrument? The trial court permitted the defendant Colthurst over objections on plaintiff's part to explain Exhibit 5 by stating the conversations had between Colthurst and the cashier of the bank at the time Exhibit 5 was signed. This evidence was competent under a plea of fraud, and the trial court treated the allegations of the answer as sufficient for this purpose, although the plea could well be made more definite and specific.

It is the accepted rule that only a party to the contract can interpose objections under the parol evidence rule. However, if the contract is made for the benefit of a third party, or a third party has the right to rely on such contract in the affirmance of his title or interest therein, then the rule may be invoked by such party.

In the instant case if a waiver or estoppel may be said to have arisen (a fact question for the jury) then it inured to the benefit of a subsequent purchaser of the instrument.

This court is still of the opinion that fact questions only are presented, and therefore the petition of appellee for a rehearing is denied.