**UNITED STATES of America, Plaintiff,**

v.

**Ben THOLEN and Annie N. Tholen, Defendants.**

**Civ. No. 674.**

United States District Court N. D. Iowa, Cedar Rapids Division. Aug. 24, 1960.

348

F. E. Van Alstine, U. S. Dist. Atty., and William R. Crary, Asst. U. S. Dist. Atty., Sioux City, Iowa, for plaintiff.

A. Fred Berger (of Berger & Shaw), Davenport, Iowa, for defendants.

GRAVEN, District Judge.

This is an action by the plaintiff as assignee of a written instrument which it alleges is the negotiable promissory note of the defendants, Ben and Annie Tholen. The plaintiff has moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

The plaintiff acquired the instrument from Allied Building Credits, Inc. by reason of indemnifying that corporation pursuant to an insurance contract negotiated under the provisions of the National Housing Act of June 27, 1934, c. 847, 48 Stat. 1246, 12 U.S.C.A. § 1701 et seq. and the subsequent amendments thereto. The defendants made due and timely demand for a jury trial.

In connection with the motion, the parties submitted a number of affidavits. The defendants were orally examined and cross-examined at considerable length and one Glenn McClain, a former branch manager of Allied Building Credits, Inc., who handled the transaction here involved in behalf of that company, was also orally examined and cross-examined at considerable length. Transcripts of the examinations were submitted with the motion, so there was available for consideration by the Court practically all the evidence the parties would present at the trial of the case.

Ben Tholen and Annie Tholen, the defendants, reside on a farm home owned by the former near the City of Tipton, Cedar County, Iowa. Allied Building Credits, Inc. is a corporation engaged in finance operations. It operates in many states. Its head office is in Los Angeles, California. It has a branch office at Davenport, Iowa. Glenn McClain was the manager of that office from 1948 until October, 1955. The Belle Aire Construction Company is an Iowa corporation engaged in construction work with its principal place of business at Davenport, Scott County, Iowa. The Belle Aire Construction Company will hereinafter be usually referred to as Belle Aire and Allied Building Credits, Inc. will hereinafter be usually referred to as Allied.

In December, 1952, the defendants, Ben and Annie Tholen, were approached by the representatives of the Belle Aire Construction Company. They were persuaded to enter into a written agreement engaging the Belle Aire Construction Company to replace the siding on the Tholens' farm home. The contract price for the required labor and materials was $1,500 with nothing to be paid down and the balance to be paid in six equal semi-annual installments. Interest and carrying charges were to be added to the installment payments as an addition to the original contract price. The total price, including interest and carrying charges, was to amount to $1,755.06. The contract specified that the labor and materials were guaranteed by the contractor.

It is the plaintiff's contention that this note was given to Belle Aire in order to secure payment in the above described transaction. The face value of the note is $1,755.06 and the installment payments provided for in the note are identical with those detailed in the form contract for labor and materials previously described. It is the contention of the defendants, Ben and Annie Tholen, that the form contract for labor and materials constituted the entire agreement between the parties. They admit that the signatures upon the note are their signatures

but contend that they do not remember signing the instrument. The Tholens admit signing their names more than once but allege that they were told by one Jack Horber, president of Belle Aire, that the additional signatures were required only as a matter of form, that nothing they signed would be negotiated, and that Belle Aire would guarantee the work to be done. Mrs. Tholen admitted that they were told at the time of signing that their installment payments were to be made at the offices of Allied Building Credits, Inc.

In October, 1952, Belle Aire made application to the Davenport office of Allied for service under the Federal Housing Administration Title I Program. Allied made inquiry as to Belle Aire through a national reporting agency and then approved Belle Aire as a dealer for whom it would handle home-improvement transactions. Allied processed the application in the same manner as it processed the applications of hundreds of dealers. On December 11, 1952, Belle Aire submitted to Allied's Davenport office an FHA conforming credit application as to the Tholen transaction. The application was accompanied by a written credit report from a local reporting agency reporting as to the financial condition and paying habits of the Tholens. The credit application contained representations from the Tholens as to their occupation, income, obligations, and the equity in the property to be improved in support of their application for credit in connection with the remodeling of their farm home. The credit application was made on an approved FHA Title I form. It bears the handwritten date of December 11, 1952. Preceding the blanks provided for signatures there appears in bold print the following:

"APPLICANT—IMPORTANT—
READ BEFORE SIGNING

"The selection of a contractor or dealer, acceptance of materials used, and work performed is YOUR responsibility. Neither the FHA nor the financial institution guarantees the material or workmanship or inspects the work performed."

Upon review of the application, Allied agreed to purchase the Tholen note from Belle Aire on a nonrecourse basis upon completion of the improvement and the submission of the proper supporting documents. On January 5, 1953, Belle Aire submitted a completion certificate signed by Ben Tholen and the other necessary supporting documents, and on that date Allied purchased the note in question.

The FHA Title I Completion Certificate is addressed to Allied Building Credits, Inc. It reads, in part, as follows:

"In accordance with my (our) Credit Application dated <u>12–11–52</u> for a loan pursuant to the <u>provisions</u> of Title I of the National Housing Act:

"CHECK HERE IF LOAN IS TO PAY FOR COST OF MATERIALS AND INSTALLATION.

"√  I (We) hereby certify that all articles and materials have been furnished and installed and the work satisfactorily completed on premises indicated in my (our) Credit Application.

\*      \*      \*      \*      \*      \*

"NOTICE TO
BORROWER

Dealer will present this Certificate to you for signature AFTER the work or the materials have been satisfactorily completed or delivered. DO NOT SIGN this Certificate until you are satisfied that the dealer has carried out his obligations to you. The selection of a dealer, the acceptance of materials used and work performed is YOUR responsibility. Neither the FHA nor the financial institution guarantee the material or workmanship or inspect the work performed.
"(Signature)
    /s/ Ben Tholen
"READ BEFORE SIGNING"

In the form the foregoing notice appeared in italics. The completion certificate also contains the following statement from Belle Aire:

"For the purpose of inducing the payment of proceeds of this loan and the insurance thereof by the FHA the undersigned certifies and warrants that the above work or materials constitute the entire consideration for which this loan is made, that a copy of the contract or sales agreement has been delivered to the borrower and the above financial institution, that this work was satisfactorily completed or materials delivered, that the above certificate was signed by the borrower after such completion or delivery, and that the signatures hereon and on the note are genuine.

"/s/ Belle Aire Construction Co. Inc.
"(Name of Dealer)
"By      /s/ Jack Horber
"(Signature)"

At the bottom of the form the following appears:

"WARNING:

Any person who knowingly makes a false statement or a misrepresentation in this certificate shall be subject to a fine of not more than $5,000 or to imprisonment for not more than 2 years, or both, under provisions of the United States Criminal Code."

In the form the warning appeared in italics.

The work had not been completed on January 1, 1953. It was not completed until February, 1953.

After purchasing the note, Allied furnished the Tholens with a coupon book authorizing the transaction and containing installment coupons to be used by the Tholens in making their payments to Allied. At the time of the purchase, Allied issued its check to Belle Aire for $1,500. It was heretofore noted that the contract price for the work was $1,500 but the amount of the note was $1,755.06 because of the addition of interest and carrying charges. Those charges were retained by Allied. The first semiannual installment of the note, due on July 1, 1953, was paid by the Tholens to Allied on July 2, 1953, and the second semiannual installment, due on January 1, 1954, was paid by the Tholens to Allied on January 5, 1954. Prior to July 1, 1954, the due date of the third semiannual installment, the Tholens expressed their dissatisfaction with the improvement but paid that semiannual installment. They made no more payments on the note. Allied, upon learning of the dissatisfaction of the Tholens with the improvement, applied pressure upon Belle Aire to rectify the situation. Belle Aire made some offer to the Tholens which was refused by them. When it appeared that Belle Aire was not going to straighten out the matter, Allied removed Belle Aire from its list of approved dealers. Upon default of the Tholens, Allied was indemnified by the Federal Housing Administration in accordance with the applicable regulations and the note was assigned to the plaintiff.

It is the contention of the defendants that the quality of both the materials and workmanship employed on the exterior of their home by Belle Aire was faulty and a good defense against any obligation owing from them to that contractor. The defendants have recovered a judgment against Belle Aire for the full amount of the contract price in the District Court of Iowa in and for Scott County. They have been unable as yet to realize upon this judgment. The defendants urge that the plaintiff may not recover on this instrument because Allied, under whose rights the plaintiff is claiming, was not a holder in due course of this instrument and therefore any defenses available against Belle Aire may be urged against the plaintiff. Secondly, the defendants allege that even if Allied were a holder in due course, defendants have a valid defense of fraud as to the character of the instrument signed. They urge that an instrument obtained under

such circumstances is a nullity and not enforceable even at the instance of a holder in due course.

In United States v. Daubendiek, D.C. N.D.Iowa 1959, 25 F.R.D. 50, at page 55, this Court stated:

"Under Rule 56(c) the court is authorized to summarily determine whether a bona fide issue of fact exists between the parties. If the court determines that such an issue is presented, the rule is inapplicable. On the other hand, if the pleadings or other proof of either party discloses that no real cause of action or defense exists, the court may determine that there is no issue to be tried by a jury and grant a summary judgment."

■ The defendants in the instant case admit making three payments as required by the terms of the note and do not claim to have paid anything more. There appears, therefore, to be no controversy as to the unpaid balance remaining on the note, but only as to the validity of the makers' defenses to suit on the note. The pivotal question to be answered in ruling on this motion is whether a determination of the validity of these defenses raises a genuine issue as to any material fact or whether their validity may be determined on the uncontroverted facts as a matter of law. In determining the true nature of the defenses alleged, it is first necessary to determine what body of law is to be applied to determine the rights of these litigants. Some relatively recent decisions of the United States Supreme Court make it apparent that state law may not always be applicable when dealing with the rights and liabilities of federal agencies. See United States v. Standard Oil Co., 1947, 332 U.S. 301, 305, 67 S.Ct. 1604, 91 L.Ed. 2067; United States v. Allegheny County, 1944, 322 U.S. 174, 183, 64 S.Ct. 908, 88 L.Ed 1209; D'Oench, Duhme & Co., Inc. v. Federal Deposit Insurance Corp., 1942, 315 U.S. 447, 456, 62 S.Ct. 676, 86 L.Ed. 956. Similarly the doctrine of Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838, severely limits the application of state law in cases involving the commercial paper of the federal government. While it might be considered that loan instruments which are executed preparatory to and anticipatory of FHA Title I insurance of the loan could come within the scope of the rule just referred to, it seems that in all of the many cases found the local version of the Uniform Negotiable Instruments Act has been regarded as applicable in determining the rights of the United States in connection with commercial paper obtained from lending institutions under the FHA Title I Insurance Program. See United States v. Dobbins, 5 Cir., 1943, 139 F.2d 169; United States v. Novsam Realty Corp., 2 Cir., 1942, 125 F.2d 456; United States v. Hansett, 2 Cir., 1941, 120 F.2d 121; United States v. Brownlee, D.C.1958, 168 F.Supp. 42; United States v. Klatt, D.C.1955, 135 F. Supp. 648; United States v. Castillo, D.C.1954, 120 F.Supp. 522; United States v. Johnson, D.C.1952, 102 F.Supp. 818. In United States v. Hansett, supra, the trial court had entertained some doubt in his application of the local Negotiable Instruments Law to the FHA transaction. In affirming, the Court of Appeals for the Second Circuit said (120 F.2d at page 122):

"We do not share the doubts of the judge as to the applicability of the ordinary law merchant to transactions financed under the National Housing Act; on the contrary it will promote its purposes to make fluid in the usual way all commercial paper issued by those for whose benefit it was enacted."

It is the view of the Court that the transaction before it is to be governed by the statutory and decisional law of the State of Iowa.

■■ The plaintiff acquired the note in question from Allied after it was due and knew that it had been dishonored by the nonpayment of the balance due. The plaintiff does not claim to be a holder in due course in its own right. Its status is dependent upon the status of

Allied at the time the latter acquired the note. Section 541.58, Code of Iowa 1958, I.C.A., provides that:

" * * * a holder who derives his title through a holder in due course, and who is not himself a party to any fraud or illegality affecting the instrument, has all the rights of such former holder in respect of all parties prior to the latter."

See Commercial Savings Bank of Washington v. Colthurst, 1923, 195 Iowa 1032, 188 N.W. 844, 191 N.W. 787; German-American Nat. Bank v. Kelley, 1918, 183 Iowa 269, 166 N.W. 1053. Section 541.59, Code of Iowa 1958, I.C.A., provides, in part, as follows:

"Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course. * * *"

Section 541.55, Code of Iowa 1958, I.C.A., provides as follows:

"The title of a person who negotiates an instrument is defective within the meaning of this chapter when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud."

The Iowa Court has ruled that the burden is on the holder to show that he or the one under whom he claims is a holder in due course when it has been shown: that the note was procured by fraud, Arnd v. Jones, 1924, 197 Iowa 244, 197 N.W. 45; Second Nat. Bank of New Hampton v. Scanlon, 1923, 196 Iowa 1305, 196 N.W. 65; Anthon State Bank v. Bernard, 1922, 194 Iowa 1090, 191 N.W. 283; Mooers v. Stalker, 1922, 194 Iowa 1354, 191 N.W. 175; German-American Nat. Bank v. Kelley, supra; that the note was negotiated contrary to agreement, Commercial Savings Bank of Washington v. Colthurst, supra; Anthon State Bank v. Bernard, supra; that there had been a conditional delivery of the instrument with a violation of the condition, Home State Bank of Royal v. Martin, 1923, 196 Iowa 1092, 195 N.W. 977; that there had been an illegal consideration given for the instrument, Plank v. Swift, 1919, 187 Iowa 293, 174 N.W. 236, 8 A.L.R. 309; or that there had been a failure of consideration, Baldwin v. Miller, Iowa 1919, 174 N.W. 375.

■ There is evidence from which a jury could find that the title of Belle Aire to the note in question was defective when it negotiated it to Allied. Therefore, under the statute, the plaintiff has the burden of proving that Allied acquired the title to the note as a holder in due course.

Section 541.52, Code of Iowa 1958, I.C.A., provides:

"A holder in due course is a holder who has taken the instrument under the following conditions:

"1. That the instrument is complete and regular upon its face.

"2. That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact.

"3. That he took it in good faith and for value.

"4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 541.57, Code of Iowa 1958, I.C.A., provides:

"A holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

■ There is no dispute as to the regularity of the instrument on its face.

The instrument is part of the record herein. It discloses no irregularity and the defendants suggest none. It was purchased by Allied long before maturity and long before it was dishonored by nonpayment. While there is a factual controversy as to the exact time when the Tholens manifested their dissatisfaction with the transaction to Allied, nowhere is it suggested that this was before July 5, 1953. The amount of consideration paid by Allied for the note is not controverted. The amount of the consideration paid for a note may become of importance in determining whether the holder is a bona fide purchaser. Windell v. Steinhoff, 1931, 211 Iowa 999, 234 N.W. 795, 797. In the case of Danford v. Winter, 8 Cir. 1951, 192 F.2d 937, 938, in a case arising under the Iowa law, the United States Court of Appeals for this Circuit stated that the fact that a purchaser paid substantially the full amount called for by the note was strong evidence of good faith. In the present case the note was indorsed by Belle Aire to Allied "without recourse." The fact that a note is indorsed "without recourse" gives rise to no inference of any infirmity in the note. Smith v. Breeding, 196 Iowa 670, 195 N.W. 208, 209. Thus, it stands uncontroverted that Allied purchased the note in question for full value, before maturity, prior to any dishonor of it, and prior to any notice imparted to Allied by the Tholens as to any infirmity in the title of Belle Aire thereto. However, it is the contention of the defendants that although those matters do stand uncontroverted the circumstances surrounding the transaction were such as to make a case for the jury. The defendants assert that the surrounding circumstances were such as would support a finding of the jury that Allied had notice of the defective title of Belle Aire and that it did not act in good faith in connection with its acquisition of the note.

Section 541.56, Code of Iowa 1958, I.C.A., provides:

To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

In Lundean v. Hamilton, 1918, 184 Iowa 907, 169 N.W. 208, at page 212, the Iowa Supreme Court stated:

"It is not enough that the purchaser be put on inquiry merely. The facts within his knowledge must be of such a character as to warrant the conclusion that he either actually knows of the infirmity, or, if he does not know, that his abstinence from making inquiry arises from a belief or suspicion that inquiry would disclose such infirmity or vice in the instrument."

In Hess v. Iowa Bankers' Mortgage Co., 1924, 198 Iowa 1365, 201 N.W. 91 at page 92, the Court, in discussing "bad faith," stated :

"The cases are uniform in their holding that mere negligence, knowledge of suspicious facts and circumstances, or failure to inquire into the consideration is insufficient to charge a holder of negotiable paper with bad faith in its procurement. * * If, however, the holder had actual knowledge of suspicious circumstances, coupled with the means of readily informing himself of the facts, and he willfully abstains from making inquiries, his intentional ignorance may amount to bad faith."

See also City Nat. Bank of Auburn, Ind. v. Mason, 1922, 192 Iowa 1048, 186 N.W. 30.

Glenn McClain, who was the manager of Allied's branch office at Davenport at the time of the transaction and who handled the transaction for Allied, testified that neither he nor anyone else connected with Allied at the time it purchased the note had any knowledge of any infirmity in it and that Allied purchased it in good faith.

Bad faith may, however, be established by circumstantial evidence even

though a denial of knowledge of infirmities by the holder is otherwise uncontroverted. Second Nat. Bank of New Hampton v. Scanlon, 1923, 196 Iowa 1305, 1306, 196 N.W. 65, 66; Lewis v. Western Stock Remedy Co., Iowa 1920, 178 N.W. 536, 539. See Cedar Point State Bank v. Youtz, 1925, 200 Iowa 86, 204 N.W. 233; Commercial Savings Bank of Washington v. Colthurst, supra; City Nat. Bank of Auburn, Ind. v. Mason, supra; German-American Nat. Bank v. Kelley, supra; Arnd v. Aylesworth, 1909, 145 Iowa 185, 123 N.W. 1000, 29 L.R.A.,N.S., 638.

The defendants contend that Allied cannot be a holder in due course because Belle Aire was acting as the agent of Allied in securing the execution of the Tholen note. The defendants rely upon the course or method of dealing between Allied and Belle Aire to establish this relationship. In that connection they refer to, among other things, the furnishing of forms by Allied to Belle Aire. The contract form was printed by Belle Aire. The name of Allied does not appear in the printed blank form. The credit application form and the completion certificate form were approved official FHA forms which were printed and furnished to Belle Aire by Allied. The name of Allied does not appear in those printed blank forms. The form note was also printed by Allied and furnished to Belle Aire. While its name is not in printed form in the space provided for the name of the payee (that space being blank), in the corner of the face of the note there appears in printing the following: "Negotiable and payable at any office of ALLIED BUILDING CREDITS, INC., with exchange." On the back of the note there appears in printing the following:

"WITHOUT RECOURSE
PAY TO THE ORDER OF
ALLIED BUILDING CREDITS, INC.
(Dealer or Contractor)"

No Iowa cases have been found which discuss the problem of whether a course of dealing between a finance company and a dealer from whom it purchases negotiable paper for value before maturity may negative the finance company's status as a holder in due course of such paper. There are, however, a number of such cases from other jurisdictions, many of which are collected in 128 A.L.R. 729 (1940). In Commercial Credit Co. v. Childs, 1940, 199 Ark. 1073, 137 S.W.2d 260, 128 A.L.R. 726, a finance company furnished an auto dealer with the forms for negotiable notes and conditional sales contracts. An indorsement of the notes from the dealer to the finance company was printed on the back subject only to signature. The note in question was executed from the purchaser of an automobile to the dealer on one of these forms and negotiated to the finance company almost simultaneously with the sales transaction. The Arkansas Supreme Court, in affirming a jury verdict that the finance company was not a holder in due course, stated (at page 262 of 137 S.W.2d, at page 729 of 128 A. L.R.):

"It [the finance company] financed the deal, prepared the instrument, and on the day it was executed took an assignment of it from the Arkansas Motors, Inc. Even before it was executed it prepared the written assignment thereon to itself. Rather than being a purchaser of the instrument after its execution it was to all intents and purposes a party to the agreement and instrument from the beginning."

In Mutual Finance Co. v. Martin, Fla. 1953, 63 So.2d 649, 44 A.L.R.2d 1, a finance company furnished an appliance dealer with forms for notes and conditional sales contracts. The notes provided that the finance company's office was to be the place of payment and contained a printed indorsement to the finance company on the back, needing only the dealer's signature. The dealer sold a deep freeze to the defendant with the finance company investigating defendant's credit before the sale was made. The dealer took defendant's note

for the unpaid purchase price and sold it to the finance company the following day. When the finance company later sued defendant on the note, the Court held that it was not a holder in due course and was subject to the defenses available against the dealer. The Court found that the finance company was a party to the original transaction because it had in effect made the loan to the buyer through the dealer. The Court stated (at page 653 of 63 So.2d):

> "We believe the finance company is better able to bear the risk of the dealer's insolvency than the buyer and in a far better position to protect his interests against unscrupulous and insolvent dealers."

Similarly, in Buffalo Industrial Bank v. De Marzio, Buffalo City Ct.1937, 162 Misc. 742, 296 N.Y.S. 783, at page 785, reversed on other grounds Sup.Ct. 1937, 6 N.Y.S.2d 568, the Court stated:

> "It is common knowledge that, whatever the situation as to finance companies was in the past, today they have become de facto departments of the great automobile businesses, without which these industries could no more operate than sans their assembly lines. The fiction has been permitted to flourish that these finance companies are foreign and distinct organizations, a fiction which no one, however, believes. * * * The finance company, being a de facto part of a great conditional sale commercial machine, should be no more allowed to escape from the effects of the misrepresentation of a salesman than is the merchant himself."

It should be pointed out, however, that in the De Marzio case, as well as in Mutual Finance Co. v. Martin, supra, the finance company investigated the customer's credit *before* any contract was entered into between the dealer and the customer. Similarly, in Commercial Credit Corp. v. Orange County Mach. Works, 1950, 34 Cal.2d 766, 214 P.2d 819; Citizens' Loan Corp. v. Robbins, La.App. 1949, 40 So.2d 503; and C.I.T. Corp.

v. Emmons, La.App.1940, 197 So. 662, particular courses of dealing between finance companies and dealers were held to negative the status of the finance companies as holders in due course. In each of these cases, however, the finance company had actually directed the transaction between the dealer and the maker of the note from its inception.

In Davis v. Commercial Credit Corp., 1950, 87 Ohio App. 311, 94 N.E.2d 710, a finance company in a transaction insured under the FHA Title I program had furnished note forms to a contractor which had a printed assignment to the finance company on the back needing only the contractor's signature. The notes had been assigned to the finance company at the same time that they were signed by the maker. The finance company was held not to be a holder in due course in this transaction. However, the result turned in part upon the finance company's knowledge of the grossly inadequate consideration given for the notes in the first instance.

In Palmer v. Associates Discount Corp., 1941, 74 App.D.C. 386, 124 F.2d 225, the fact that a note purchased by a finance company referred to an extrinsic agreement between the finance company and a dealer to set up a reserve fund was found to negative the finance company's status as an innocent purchaser of the note. In United States v. Schaeffer, D. C.1940, 33 F.Supp. 547, a Federal Court found that a finance company was in fact a subsidiary of a supplier. The Court held that because the finance company was the alter ego of the supplier, it was subject to the same defenses. In so holding, however, the Court stated that the same result would not apply to a truly independent finance company. See also United States v. Klatt, D.C.1955, 135 F.Supp. 648.

Several courts are of the view that the furnishing of forms for notes and conditional sales contracts is not in itself evidence of a sufficiently close relationship between finance company and dealer to negative the finance company's status as a holder in due course. Public

Loan Corp. of Little Rock v. Terrell, 1955, 224 Ark. 616, 275 S.W.2d 435; Allied Bldg. Credits, Inc. v. Mathewson, 1952, 335 Mich. 270, 55 N.W.2d 826; Mayer v. American Finance Corp., 1935, 172 Okl. 419, 45 P.2d 497; Implement Credit Corp. v. Elsinger, 1954, 268 Wis. 143, 66 N.W.2d 657, 67 N.W.2d 873. See Davis & Worrell v. General Motors Acceptance Corp., 1922, 153 Ark. 626, 241 S.W. 44. The fact that all the parties involved in the transaction knew at the time of the execution of the instrument that it was to be negotiated to the finance company has been found not to affect the finance company's position as a holder in due course. Garst v. General Contract Purchase Corp., 1947, 211 Ark. 526, 201 S.W.2d 757; Prudential Savings Bank v. Tomassone, Sup.Ct.1957, 7 Misc. 2d 444, 164 N.Y.S.2d 620. In the latter case the whole transaction of securing and assigning the note took place in the offices of the bank which claimed as a holder in due course. This was held not to negative the bona fides of the bank's purchase or make them a party to the original transaction.

Implement Credit Corp. v. Elsinger, supra, commented on in 39 Minn.L.Rev. 775 (1955), presents a full discussion of this area of the law. There a finance company organized by a few implement dealers to finance sales transactions for the members of an implement dealers' association, but which was not controlled by the association itself, furnished to the association members forms upon which conditional sales contracts and negotiable notes could be executed. On the back of each note form was a printed assignment from the dealer to the finance company. In addition, the finance company entered into a dealer's agreement with each dealer setting up a reserve fund to protect the finance company from losses. The Court held that such a relationship between the parties did not deprive the finance company of its status as a holder in due course. The Court said (at page 666 of 66 N.W.2d):

"A very considerable segment of our economy is dependent for its continued prosperity upon such free flow of credit, and anything which delays or impedes such process may well be regarded as against the public interest. Finance companies and banks hestitate to purchase such notes, contracts, and chattel mortgages, if executed on printed forms with which they are not familiar, without first submitting them to the scrutiny and opinion of their attorneys. To obviate such delays and expense, these financial institutions have widely adopted the practice of having their own attorneys draft forms of notes, including the indorsements or assignments on the back * * * By so doing such banks and finance companies are better enabled to render prompt service to dealers when they present customer paper for discount because there is no delay in passing on the forms of the instruments when their own forms have been used by the dealers.

"We can perceive of no reason based upon either logic or public policy why a finance company or bank which supplies such blank printed forms should be held thereby to have constituted the dealers their agents, or should be deemed to have participated in the sale by the dealer to the customer * * *. For these reasons, this court does not consider the cases of Commercial Credit Co. v. Childs, supra, and Mutual Finance Co. v. Martin, supra, holding to the contrary on this point should be followed as precedents in this state for we believe them to be based upon an unsound premise."

■ It is the view of the Court that there is no factual controversy as to the actual relationship between Allied and Belle Aire, but only as to the legal consequences of such relationship. The Court finds that the record made upon this motion discloses no relationship between Allied and Belle Aire which would make the former a party to the original contract made with the Tholens. This

contract was between Belle Aire and the Tholens and involved no one else. Allied did not enter the transaction until it was completed as between the original parties thereto. Allied was free at that stage not to have purchased the paper. Similarly, the use of Allied's printed form did not prevent Belle Aire from selling the note to another finance company. There is evidence in the record that Belle Aire did in fact sell its paper to other finance companies. The furnishing of the note forms was for Allied's convenience if it chose to purchase commercial paper from a contractor or dealer. The forms were drawn so as to meet FHA regulations. It is clear that the legal relation of Allied to Belle Aire was that of an independent lending agency.

It was heretofore noted that the burden is upon the plaintiff to establish that Allied was a holder in due course of the note. There inheres in the motion of the plaintiff for summary judgment the question as to whether under the showing in this case a verdict would properly be directed in its favor upon the trial of the case. There is some apparent conflict among the Iowa cases as to the matter of a direction of a verdict in favor of a holder of a note who bears the burden of proof on the issue of whether that holder was a holder in due course. A number of Iowa cases bearing upon that question will next be considered. In Connelly v. Greenfield Savings Bank, 1921, 192 Iowa 876, 185 N.W. 887, the plaintiff brought an action in replevin to recover a note which he alleged was procured from him by fraud. The plaintiff prevailed over the holder of the note who intervened in the action. On appeal the intervenor-bank urged that a verdict should have been directed for it below because it was a holder in due course. The Supreme Court stated (at page 889 of 185 N.W.):

"Generally speaking, the mere fact that the holder of a note testifies that he received it without knowledge or notice of any defect in the title thereto or of any defense on part of the maker is not sufficient to establish the bona fides of his possession, as a matter of law. The issue so presented is one of fact upon which the holder must assume the burden of an affirmative showing. * * * It is a rare occasion which justifies a court in directing a verdict upon a fact issue in favor of the party on whom rests the burden of proof."

Later in the same opinion the Court stated (at page 891 of 185 N.W.):

"Such is the accepted doctrine of all the precedents we have cited, and of many more which we do not take time to collate. It is not to be denied that there are precedents from some courts tending to sustain the position taken by counsel for the appellant, but if they may be said to indicate the existence of two divergent lines of authority, this court is distinctly aligned with those which hold that under all ordinary circumstances the question of whether the holder of a negotiable instrument fraudulently procured or wrongfully negotiated has maintained the burden of showing that he acquired it in good faith and without notice is for the jury."

The Iowa Court has since clearly recognized, however, that the question of whether a party acquired a note in good faith need not always be submitted to the jury even though the holder may bear the burden of proof as to that issue. In Grimes Savings Bank v. McHarg, 1927, 204 Iowa 322, 213 N.W. 798, at page 800, the Court stated:

"It is apparent, from a review of the cases, that there are two lines of decisions involving the question of submitting to the jury the bona fides of the purchaser of negotiable paper, but it must be borne in mind that any case of this character must be bottomed on its own facts and circumstances. We no longer adhere to the rule that in every suit by an indorsee of a negotiable instru-

ment the question of whether the plaintiff acted in bad faith must be submitted to the jury no matter how conclusively his good faith may be proven by the uncontradicted evidence. See Second National Bank v. Scanlon, 196 Iowa, 1305, 196 N.W. 65; First National Bank of Montour v. Brown, 197 Iowa, 1376, 199 N.W. 272; First National Bank v. Dutton, 199 Iowa, 468, 202 N.W. 228.

"The rule, if it may be termed a rule, is stated in Commercial Savings Bank v. Colthurst, 195 Iowa, 1032, 188 N.W. 844, 191 N.W. 787:

" 'If conflicting inferences may be drawn from the facts, viewed individually or collectively, then the jury must decide. A court may be justified in refusing to submit the question of good faith to the jury, but only in a case in which the evidence offered by the plaintiff holder is uncontradicted, his witnesses stand unimpeached, directly or circumstantially, and no reasonable or fair inferences tending to prove bad faith can be drawn by reasonable men from the facts and circumstances surrounding the negotiation and purchase of the instrument.' "

In applying the above test the Court in the McHarg case found that, notwithstanding the direct testimony of the officers of the plaintiff bank that the bank purchased the notes in good faith, the evidence was not so indubitable and conclusive that the trial court should have directed a verdict for the plaintiff.

In Second Nat. Bank of New Hampton v. Scanlon, 1923, 196 Iowa 1305, 196 N.W. 65, at page 66, the Court stated:

"The evidence that the payee [sic] of a negotiable instrument is a holder in due course may be so indubitable as to make it the duty of the trial court to direct a verdict in behalf of the holder of such instrument, even though it be established that the instrument was induced by fraud on the part of the original payee."

The Court found, however, that the failure to produce certain letters known to refer to the note in suit was a circumstance from which a jury might draw an inference of bad faith.

The Iowa Court has approved the directing of a verdict for a holder of a negotiable instrument who bears the burden of proof as to his good faith in several cases. See First Nat. Bank of Fairfield v. Dutton, 1925, 199 Iowa 468, 202 N.W. 228; First Nat. Bank of Montour v. Brown, 1924, 197 Iowa 1376, 199 N.W. 272; Arnd v. Jones, 1924, 197 Iowa 244, 197 N.W. 45; Smith v. Breeding, 1923, 196 Iowa 670, 195 N.W. 208. In First Nat. Bank of Montour v. Brown, supra, the Court stated (at page 272 of 199 N.W.):

"The pertinent question is: Does the evidence directly or circumstantially impeach the good faith of the bank in the purchase of the note? May reasonable inferences be drawn from the facts and circumstances surrounding the negotiation and purchase of the instrument tending to prove the mala fides of the purchasing bank? * * We fail to discover any evidence in the record or any circumstances from which inferences may be drawn that impugns or impeaches the good faith of the purchasing bank. We are dealing with a negotiable instrument—a courier without luggage. Not every case involving the bona fides of a purchaser presents a jury question."

In many other cases the Iowa Court has reversed the trial court for directing a verdict for the holder of a negotiable instrument because it felt that there were present circumstances from which a jury might infer bad faith. See Grimes Savings Bank v. McHarg, supra; Boone Nat. Bank v. Evans, Iowa 1927, 213 N.W. 786; Ottumwa Nat. Bank v. Starns, 1926, 202 Iowa 412, 210 N.W. 455; Mooers v. Stalker, 1922, 194 Iowa 1354, 191 N.W. 175; Indiana Wagon Co. v. Van De Pol, 1918, 182 Iowa 763, 166 N.W. 200; Perry Savings Bank v. Fitz-

gerald, 1914, 167 Iowa 446, 149 N.W. 497. Circumstances from which the Iowa Court has found that bad faith might be inferred by a jury include: failure to produce the best evidence available as to good faith, Pierce v. Lichtenstein, 1932, 214 Iowa 315, 242 N.W. 59; Second Nat. Bank of New Hampton v. Scanlon, 1923, 196 Iowa 1305, 196 N.W. 65; Arnd v. Aylesworth, 1909, 145 Iowa 185, 123 N.W. 1000, 29 L.R.A.,N.S., 638; business relationships between the parties, Farmers' & Merchants' State Bank v. Shaffer, 1915, 172 Iowa 173, 154 N.W. 485; relationship by marriage between the parties, Pierce v. Lichtenstein, supra; Seibel v. Lampe, 1924, 197 Iowa 328, 196 N.W. 1016.

The Court of Appeals for the Eighth Circuit in the case of Colthurst v. Lake View State Bank, 1927, 18 F.2d 875, discusses the Iowa law in this area. They affirmed the trial court in directing a verdict for the holder of a note, stating (at page 876):

> "The contention of defendant that even in the absence of any disproof of the prima facie case made by the plaintiff it was still the duty of the court to submit the case to the jury solely upon the matter of credibility is not tenable. Even if on that question the decisions of the Iowa Supreme Court were controlling, and it is on them the defendant bases his argument, they do not support the contention. Earlier decisions by that court apparently did. * * * But not so its later pronouncements."

The Court cited first Nat. Bank of Fairfield v. Dutton, supra, and First Nat. Bank of Montour v. Brown, supra, in support of its decision.

Closely related to the problem just discussed is the question of just whose testimony must be used to negative notice of infirmities on behalf of a lending institution. In McKnight v. Parsons, 1907, 136 Iowa 390, 113 N.W. 858, at page 861, 22 L.R.A.,N.S., 718, the Iowa Court stated:

> "The testimony of the cashier of the bank that he or the bank purchased the note for value before maturity, even though he be not disputed by any other witness to the transaction, is not necessarily sufficient to enable the court to say as a matter of law that he received it in good faith. Such evidence does not negative notice or knowledge on part of other officers of the bank."

The test laid down in the McKnight case was approved in First Nat. Bank v. Wise, 1915, 172 Iowa 24, 151 N.W. 495. This view has since, however, been disapproved by the Iowa Court. In First Nat. Bank of Fairfield v. Dutton, 1925, 199 Iowa 468, 202 N.W. 228, at page 231, the Court, after a thorough discussion of the prior Iowa cases, stated:

> "We deem the correct rule to be that where the bank, being a corporation, attempts to establish itself as an innocent purchaser, that it must negative first, by the officer or employé who had the transaction in charge of purchasing the paper; second, by any other officer of the bank who had to do with said transaction, or who had knowledge that such a transaction was under consideration or contemplation, and, if notice be squarely negatived by these parties, their testimony is uncontradicted and the circumstances shown in the case do not tend to impeach their testimony, then the court will be warranted in holding, as a matter of law, so far as this question is concerned, that the bank was an innocent purchaser."

The rule of the Dutton case has been reaffirmed in Old Line Life Ins. Co. of America v. Jones, 1928, 206 Iowa 664, 221 N.W. 210, and Williamson v. Craig, 1927, 204 Iowa 555, 215 N.W. 664. See also Perry Savings Bank v. Fitzgerald, supra; Robertson v. United States Live Stock Co., 1914, 164 Iowa 230, 145 N.W. 535.

█ The Court is unable to find any factual showing in connection with the

acquisition of the note in question by Allied from which it might be reasonably inferred that Allied had notice of any infirmity in the title of Belle Aire or that it acted other than in good faith. The defendants were given opportunity by means of affidavits and by the taking of oral testimony to bring out or call attention to facts which might make a jury issue as to the question of whether Allied was a holder in due course of the note. It is the view of the Court that they have failed to so do and that upon trial it would be the duty of the Court to direct a verdict in favor of the plaintiff on that issue. This view is in accord with that of other courts in somewhat similar cases. See United States v. Skinner, D.C.1956, 137 F.Supp. 234; United States v. McCulloch, D.C.1939, 26 F.Supp. 7.

Remaining to be considered is the defendants' claim that the circumstances under which the note was obtained from them amounted to sufficient fraud as to the nature of the instrument signed that the instrument was a nullity and not enforceable even in the hands of a holder in due course. In Britton, Bills and Notes (1943), at pages 567–68, it is stated:

"For the purpose of determining the rights of a holder in due course there are two kinds of fraud. One species of fraud operates only as a personal defense, the other operates as a real defense. The difference between the two types is determined by the difference in the extent of the knowledge of the facts possessed by the signer of the instrument at the time he signs. The problem was first presented to the English courts in 1869 in the case Foster v. Mac-Kinnon. [L.R. 4 C.P. 704.] The defendant indorsed a bill of exchange, upon the representation of the party requesting the signature, that the instrument was a guaranty, he believing that it was such a guaranty similar to the one he had heretofore signed at the request of the same party * * * The plaintiff was a holder in due course. The Lord Chief Justice instructed the jury: 'If the indorsement was not the signature of the defendant, or if, being his signature, it was obtained upon a fraudulent representation that it was a guaranty, and if the defendant was not guilty of negligence in so signing the paper, he was entitled to the verdict.' * * * The giving of the quoted instruction was sustained. In discussing the principle involved, Byles, J., said: ' * * And it is invalid not merely on the ground of fraud where fraud exists, but on the ground that the mind of the signer did not accompany the signature * * * and therefore in contemplation of law [he] never did sign, the contract to which his name is appended.' " (Footnote numbering omitted.)

An annotation in 160 A.L.R. 1295 (1946) contains an exhaustive collection of cases on this subject. The annotator concludes (p. 1295):

"In most of the states in this country, as well as in England and Canada, the prevailing doctrine is that deception as to the character of the instrument signed, without negligence of the signer, constitutes a good defense against a bona fide holder of negotiable paper * * * the practical difficulties arising being ordinarily those with regard to what amounts to negligence in such cases."

The defense in question was successfully urged in Millrose Corp. v. Brent, 1959, 106 U.S.App.D.C. 242, 271 F.2d 508. The plaintiff cites the case of Danford v. Winter, 8 Cir., 1951, 192 F.2d 937, which is from Iowa. The case is not particularly helpful since it involved fraudulent representations to secure the giving of a promissory note, but there was no fraud as to the nature of the instrument signed. The maker in that case realized he was signing a note. In the case of United States v. Castillo, D.C.1954, 120 F.Supp. 522, the United States was bringing suit on an FHA note acquired in the same manner as the note in the

instant case. The defendants, who were illiterate, successfully urged the defense that the note had been secured from them without their knowledge that they were giving a note.

The Iowa Supreme Court has apparently followed the rule of the English case Foster v. MacKinnon, supra. In Caulkins v. Whisler, 1870, 29 Iowa 495, the defendant was induced to sign a blank piece of paper believing that its purpose was to enable a company for which he hoped to be an agent to identify his signature. The blank paper was filled in after he signed it so as to be a promissory note. The lower court held that such fraud constitutes the instrument a forgery and that it might not be enforced by an innocent holder. The Supreme Court affirmed, stating (at page 497):

> "He was not guilty of negligence in thus giving it, for it is not unusual, in order to identify signatures, and for other purposes for men thus to make their autographs. The defendant cannot be regarded as being so far in fault in the transaction that he ought to be required to bear the loss resulting from the crime."

In First Nat. Bank of Grand Haven v. Zeims, 1894, 93 Iowa 140, 61 N.W. 483, the defendant signed his name to a blank promissory note form. He alleged that he was induced to place his signature on the paper as a means of identification. The form was eventually filled in and negotiated to the plaintiff, an innocent holder. The Supreme Court affirmed a jury verdict for the defendant, stating (at page 484 of 61 N.W.):

> "There is a sharp distinction between cases where the signer of the paper executes an instrument intending it to be a contract in some form and where he merely signs a paper to furnish the means of identification."

The Court said that the signing of a paper with unfilled blanks was not in itself negligence.

In Green v. Wilkie, 1896, 98 Iowa 74, 66 N.W. 1046, 36 L.R.A. 434, the defendant held land subject to a charge by his father. A real estate dealer agreed to convey defendant's land and the father was to release his charge in return for a charge on other land of the defendant and a note for one hundred dollars. The dealer induced defendant, who could not read, to sign a note for one thousand dollars payable to the dealer's wife when defendant thought he was signing a one hundred dollar note payable to defendant's father. The Supreme Court reversed the trial court's verdict for an innocent holder of the note. It stated (at page 1048 of 66 N.W.):

> "It is to be remembered that the rule we apply is not the usual one in which innocent holders of negotiable paper are protected against fraud in the inception of a note. In such cases there is a note, but the bona fides of it is questioned. In this case the note has never existed in the sense of the minds of the parties meeting to give it validity, and there is no negligence to render the defendant liable on other grounds."

The Court felt that the defendant was not negligent in that case because the person with whom he was dealing had no direct interest in the transaction which the defendant thought he was entering.

It should be noted that the three Iowa cases just discussed were decided before the enactment of the Uniform Negotiable Instruments Law in this state. This Act (Iowa Acts, 29 G.A. ch. 130 (1902); ch. 541, Code of Iowa 1958, I.C.A.), makes no specific reference to fraud as to the character of the paper signed. Section 55 thereof (Sec. 541.55, Code of Iowa 1958, I.C.A.), set out supra, provides that the title of one obtaining an instrument by fraud is defective. Section 57 thereof (Sec. 541.57, Code of Iowa 1958, I.C.A.), set out supra, provides that a holder in due course holds the instrument free from any defect in title of prior parties.

Thus, the question arises, does the statute in any way abrogate the common-law rule? In the case of C. I. T. Corp. v. Panac, 1944, 25 Cal.2d 547, 154 P.2d 710, 160 A.L.R. 1285, the Supreme Court of California considered this question and decided that the statute does not change the common-law rule. The Court stated (at page 713 of 154 P.2d, at page 1288 of 160 A.L.R.):

> "It was not intended by the enactment of the negotiable instruments law that the whole law of contracts was to be abrogated unless clearly indicated. The defense under consideration goes to the existence of any contract. If there is no contract there is no negotiable instrument, which is a simple contract."

A similar result was reached in New Jersey Mortgage & Inv. Co. v. Dorsey, 1960, 60 N.J.Super. 299, 158 A.2d 712, the Court grounding its decision, in part, on Section 475 of the Restatement of Contracts. In Britton, Bills and Notes, supra, it is said (p. 586):

> "The Negotiable Instruments Law does not deal expressly with fraud as a real defense. But the cases decided in jurisdictions which have adopted the Act continue the common law rule, usually without reference to the statute."

This would seem to be the situation in Iowa. In First Nat. Bank of Shenandoah v. Hall, 1915, 169 Iowa 218, 151 N.W. 120, it was held to be error to direct a verdict for an innocent holder of a note when the defendant alleged that she thought that the instrument she signed was a divorce petition rather than a note. The defendant could not read because of defective eyesight and was dealing in the transaction with her own attorney. The Court, in reaching its decision, relied on the case of Green v. Wilkie, supra, and upon the English case of Foster v. MacKinnon, supra. Although the case was decided over twelve years after the adoption of the Negotiable Instruments Law in Iowa, no reference was made in the opinion to that Act.

Caulkins v. Whisler, supra; First Nat. Bank of Grand Haven v. Zeims, supra; Green v. Wilkie, supra; and First Nat. Bank of Shenandoah v. Hall, supra, are the only Iowa cases in which fraud in securing the execution of a note has been effectively urged against an innocent holder. An examination of these cases discloses that in each of them the signer either could not read or else signed his name to a blank sheet of paper so that there was in fact nothing for him to read. Further examination also reveals that in Green v. Wilkie, supra, and First Nat. Bank of Shenandoah v. Hall, supra, the defendants, in addition to being unable to read, were dealing with individuals or in situations which were not likely to arouse suspicion. In other cases the Iowa Court has found that inability to read, alone, will not absolve one from negligence in signing a written instrument. In Fayette County Savings Bank v. Steffes, 1880, 54 Iowa 214, 6 N.W. 267, a jury made a special finding that the defendant could not read English and that there was no person within two miles who could read it to him. The jury also made a special finding that the defendant believed the note which he signed was for only sixty-five dollars when in reality it was for one hundred and ninety-five dollars and that the defendant signed the note only because of the payee's misrepresentations. In spite of this the Supreme Court affirmed the jury's verdict for an innocent holder of the note because the jury might have found that the defendant did not exercise proper care in dealing with a stranger. The Court also emphasized that the defendant knew that he was signing a note rather than being deceived as to the nature of the instrument signed. See also First Nat. Bank of Sioux Center v. Ten Napel, 1924, 198 Iowa 816, 200 N.W. 405; Shores-Mueller Co. v. Lonning, 1913, 159 Iowa 95, 140 N.W. 197.

The Iowa Court has considered the problem of the negligent signing of

negotiable instruments and the negligent signing of other types of written instruments in the same light in regard to situations of parties signing without reading. The absence of glasses necessary for reading will not excuse the failure to read. Griffiths v. Brooks, 1940, 227 Iowa 966, 289 N.W. 715. Several cases have emphasized that a higher degree of care is required in regard to signing a written instrument when one is dealing with a stranger or with an adversary. See Lillie v. Shriver, 1921, 190 Iowa 861, 179 N.W. 632; Fayette County Savings Bank v. Steffes, supra; Douglass v. Matting, 1870, 29 Iowa 498. Other cases indicate that a higher degree of care is required in signing one's name to an instrument which is known to be a note or other contractual obligation than in signing an instrument which one thinks is not binding upon him. See First Nat. Bank of Grand Haven v. Zeims, supra; Fayette County Savings Bank v. Steffes, supra; Caulkins v. Whisler, supra; Douglass v. Matting, supra. It is well established in Iowa that if a party is able to read and has a chance to read a written instrument before signing it, his negligence will estop him from claiming that the instrument is not binding. Schlosser v. Van Dusseldorp, Iowa 1960, 101 N.W. 2d 715, 719; Griffiths v. Brooks, supra; Preston v. Howell, 1934, 219 Iowa 230, 257 N.W. 415, 97 A.L.R. 1140; Crum v. McCollum, 1930, 211 Iowa 319, 233 N.W. 678; Commercial Savings Bank of Ames v. Carey, 1929, 207 Iowa 1060, 224 N.W. 62; First Nat. Bank of Winterset v. Phillips, 1927, 203 Iowa 372, 212 N.W. 678; Midland Mortgage Co. v. Rice, 1924, 197 Iowa 711, 198 N.W. 24; Bank of Holmes v. Thompson, 1922, 192 Iowa 1032, 185 N.W. 986; Reid, Murdock & Co. v. Bradley, 1898, 105 Iowa 220, 74 N.W. 896; Wright, Dryden & Co. v. Flinn, 1871, 33 Iowa 159. See Rasmus v. A. O. Smith Corp., D.C.N.D.Iowa 1958, 158 F.Supp. 70, 85; Shores-Mueller Co. v. Lonning, supra. In Bank of Holmes v. Thompson, supra, the Court approved (at page 987 of 185 N.W.) the following instruction to the jury in a case where the accommodation indorsers of a note defended on the theory that they did not know what they were signing:

"If you find that any one of the defendants in this case had capacity to read the instrument signed by him, and had an opportunity to do so, and that no fraud was practiced upon him to prevent him from reading it, but that they had full opportunity to read it before signing, and chose to rely upon what Weeks said to him about it, he is estopped by his own negligence from claiming that the same is not legal and binding."

Ordinarily, the mere misrepresentation of the contents of a written instrument by the other party thereto is not sufficient to relieve one of his duty to read before signing. See Boyd v. Miller, 1930, 210 Iowa 829, 230 N.W. 851; Lillie v. Shriver, supra; Reid, Murdock & Co. v. Bradley, supra; Fayette County Savings Bank v. Steffes, supra; Wright Dryden & Co. v. Flinn, supra. This is true in actions between the original parties to the instrument as well as those involving innocent holders. See Midland Mortgage Co. v. Rice, supra; Lillie v. Shriver, supra. Misrepresentation of the contents of a written instrument by the other party thereto may, however, under conditions commanding trust or confidence, amount to sufficient deception that one may sign without reading and not be held guilty of negligence. See Merriam v. Leeper, 1921, 192 Iowa 587, 185 N.W. 134; Christensen v. Harris, 1920, 190 Iowa 256, 180 N.W. 325; Burlington Lumber Co. v. Evans Lumber Co., 1896, 100 Iowa 469, 69 N.W. 558.

Some of the Iowa cases do imply that the question of negligence in signing a written instrument is necessarily one for a jury. See Perry Nat. Bank v. Engnell, 1924, 198 Iowa 26, 199 N.W. 283; Seibel v. Lampe, 1924, 197 Iowa 328, 196 N.W. 1016; Bank of Holmes v. Thompson, supra; Shores-Mueller Co. v. Lonning, supra. It seems accurate to say, however, that the language of these cases may be limited to their immediate facts. There are several Iowa cases holding that

allegations of fraud in procuring the execution of a written instrument, even if proven, would not make a case for the jury because of the undisputable negligence of the signer. The case of Griffiths v. Brooks, supra, although not directly in point because the allegations of fraud were there used to seek affirmative relief rather than as a defense, involves a directed verdict on the issue of negligence. There the plaintiff, in buying an automobile, signed some papers without reading them. The plaintiff alleged that at no time was he told that he would have to give a conditional sales contract or note and that he signed the instruments only because of the dealer's representations that he was signing a formal order blank. The note plaintiff signed was negotiated to an innocent purchaser and plaintiff brought this action against the dealer for the amount of the note alleging that he had paid for the car in cash and at no time owed the dealer any money. The trial court directed a verdict for the defendant and the Supreme Court affirmed, stating (at page 718 of 289 N.W.):

> "We are of the opinion that plaintiff's own doings were, in view of the circumstances and facts shown, such that he may not now press the claim that his signatures to the conditional sales contract and note were procured by fraud and deceit. It follows that the first ground of the motion [negligence] warranted the ruling thereon."

Verdicts were also directed against parties urging fraud in the procurement of a written instrument by a misrepresentation of its contents in Jenkins v. Clyde Coal Co., 1891, 82 Iowa 618, 48 N.W. 970, and Bannister v. McIntire, 1900, 112 Iowa 600, 84 N.W. 707. Although these cases did not involve negotiable instruments, the grounds for the decisions rest upon the negligence of the unsuccessful party in signing the instrument in question without reading it. In McKinney v. Herrick, 1885, 66 Iowa 414, 23 N.W. 767; McCormack v. Molburg, 1876, 43 Iowa 561; and Douglass v. Matting, supra, the

issue of negligence in signing a written instrument was determined on demurrer. The latter case involved a suit on a note where the defense was fraudulent representation as to the nature of the instrument signed.

The education and background of the defendants was not specifically brought out. Ben Tholen was fifty-six years of age and Annie Tholen was forty-nine years of age at the time of the transaction. There is no claim that they were illiterate or that their eyesight was impaired. The transcript of their oral examination shows that they intelligently answered the questions put to them relating to the transaction.

The defendants testified that all of the instruments signed by them were signed at the same time. The genuine signatures of both defendants are on the contract, the credit application, and the note. The genuine signature of Ben Tholen is on the completion certificate. The signing of that certificate by Ben Tholen alone met the FHA requirements. The defendants testified that they remembered signing the contract and that the representatives of Belle Aire gave them some other instruments to sign along with the contract "as a matter of form." The credit application contains personal information as to them which could only have been furnished by them. They knew they were signing a contract under which they agreed to pay the sum of $1,755.06. Therefore, it was not a situation where there was no intent to incur financial liability. The representatives of Belle Aire were strangers to the defendants so it was not a situation involving a fiduciary or confidential relationship. The claim of the defendants in this connection is in essence that while they intended to incur liability and understood that they were incurring liability, they did not intend to have that liability evidenced by a negotiable promissory note. The matter of the transfer of their obligation was discussed at the time of the transaction. It is the claim of the defendants that Belle Aire agreed not to transfer that obligation.

Shortly after January 5, 1953, the defendants were notified by Allied to make their payments to that corporation. They made no complaint to Allied for several months thereafter as to their obligation having been transferred by Belle Aire in violation of the claimed agreement.

There is no showing that the defendants were prevented from reading the instruments presented to them by Belle Aire. Their showing is that when they signed the contract they were given other papers to sign "as a matter of form." It was the testimony of the defendants, as heretofore noted, that all of the instruments were presented and signed on the same occasion. It is noted that their signatures to the credit application and note appear in ink while their signatures to the contract and completion certificate appear in pencil. So, if they did sign all of the instruments on the same occasion they shifted from pen to pencil or vice versa during the course of the signing.

For the purposes of the present motion, the testimony of the defendants that all of the instruments signed by them were signed on one occasion has to be regarded as a verity. Such being the situation, it is manifest that Ben Tholen at the same time he signed the contract also signed the completion certificate certifying that the improvement had been completed and that the work and materials were satisfactory. His signature to that instrument appears about one-sixteenth of an inch above the black lettered words "READ BEFORE SIGNING." Without the signed completion certificate, the note in question could not have been negotiated to Allied. That certificate, as heretofore noted, was presented to Allied at the time they received the loan and purchased the note. The different instruments signed by the defendants bristled with bold-faced warnings which warned the defendants against doing the things they did do in connection with the execution of the papers in question. It is clear that they did not heed those warnings and did sign vital instruments without

reading them. It was heretofore noted that their excuse for not reading the instruments is that the representatives of Belle Aire told them they were signing them "as a matter of form." It is the view of the Court that the factual showing is not such as would sustain a jury finding that they were not guilty of negligence in affixing their signatures to the note in question.

It is apparent from the number of cases in the reports having to do with FHA improvement loans that some dealers have been engaged in high pressure salesmanship and in making false representations in connection therewith. It is also apparent that in spite of the bold-faced print warnings and admonitions given by the FHA in its forms that some home owners will execute instruments without giving heed thereto. Once a home owner has done this, his securing of redress is hampered and made difficult because, on the basis of the instruments executed by him, the note involved is promptly sold to a finance institution and later in many cases is passed on to the United States under its FHA indemnity agreement.

In the present case it is clear that the defendants were grievously wronged by Belle Aire and it has failed to rectify the wrong. Any rectification of that wrong in this proceeding would be at the expense of innocent third parties. It is the view of the Court that it cannot in this proceeding rectify the wrong without disregarding well-established rules of law relating to negotiable instruments.

It is the view of the Court that there is no genuine issue as to Allied being other than a holder in due course of the note in question and that the plaintiff, as the assignee of Allied, is entitled to judgment against the defendants as a matter of law for the balance due on the note declared on.

It is the holding of the Court that the motion of the plaintiff for summary judgment be and the same is hereby sustained.